[Philadelphia, February 15, 1833.]

## NEWBOLD *against* WRIGHT and SHELTON.*

### IN ERROR.

The withdrawal of material facts from the jury is error.

A factor cannot pledge the goods of his principal for his own debt.

A usage cannot be set up in opposition to a general rule of law; therefore, a usage for factors to pledge the goods of their principals, is bad.

A supercargo, to whom various shipments have been consigned by the same vessel, with instructions from one of the shippers to obtain an advance on his goods, cannot make a general deposit of the whole cargo, to secure a general advance, so as to bind his principals. It is his duty to keep the different interests separate.

Where a general advance is made to a factor on a general deposit of goods owned by various persons, it must be borne rateably by all.

THIS was a writ of error to the District Court for the City and County of *Philadelphia.* It was an action of *assumpsit* brought by the plaintiff in error to recover the proceeds of his goods, sold by the defendants.

On the trial of the cause, the facts which appeared in evidence were substantially as follows :

In *April* 1823, the plaintiff, by his agents *Thomas & Martin,* made a shipment of nine hundred and sixty pieces of blue Moreas, valued at two thousand seven hundred and nine dollars and twenty-four cents, to *St. Jago de Cuba,* by the schooner *Sally and Polly,* consigned to *Clayton Hollinshead,* supercargo on board, for sales and returns. In the letter of instructions, the supercargo was directed to sell the goods, if he could, but if not, to obtain an advance of one-half or two-thirds of their value in coffee. Various other shipments were made in the same vessel, likewise consigned to *Hollinshead,* and part of the cargo belonged to himself. He arrived in *St. Jago* in *May,* 1823, sold two hundred pieces of the plaintiff's goods to pay duties and charges, and left the balance of the plaintiff's goods, also the goods of the other shippers, and his own, which were then unsold, with the defendants, who were commission merchants at *St. Jago,* for sale. He gave the defendants at the same time a list of the goods left with them, in which the names of the various owners were marked, under the description of their goods. During *Hollinshead's* stay at *St. Jago,* he made a shipment through the agency of the defendants, of sugar, coffee and molasses, amounting to fourteen thousand eight hundred and eleven dollars and seventy-five cents, on board the brig *Union,* bound to *Philadelphia.* In account-current between the defendants and *Hollinshead,* dated *July* 3, 1823, he was charged with the amount of the shipment per the *Union,* and credited with seven thousand three hundred dollars, for bills drawn by him by virtue of a letter of credit, the extent of which did not appear, and

* For the report of this case, the Reporter is indebted to JOHN L. NEWBOLD, Esq., who was of counsel in the cause.

(Newbold *v.* Wright and Shelton.)

with the net sales of the *Sally and Polly's* cargo. The account showed a balance against him of six thousand and sixty-two dollars and seventy-three cents. On the 5th of *July, Hollinshead* left *St. Jago,* after requesting the defendants, by letter dated 4th *July,* to dispose of the goods left for his account; he hopes the flour will bring the limits; but says they must do the best they can with it; he directs the dry goods to be sold for the prices fixed,—and states that some satins and teas would soon arrive, which he wishes them to sell, and credit him with five per cent. commissions for sales, and two and a half for purchasing or remitting. On *Hollinshead's* return to *Philadelphia,* he settled with *Thomas & Martin,* on the 9th of *August,* 1823, for the two hundred pieces of the plaintiff's goods, which were sold, and paid them thirty-seven dollars and sixteen cents, the balance of their proceeds after deducting charges, &c. A correspondence took place between *Hollinshead* and the defendants, and *Thomas & Martin* and the defendants, of which the following is the substance:

*May* 7, 1824, *Hollinshead* writes to the defendants, acknowledging the receipt of theirs of the 13th of *April;* was astonished the flour turned out so badly; wishes the defendants to write to *Thomas & Martin,* respecting the blue *India* goods; inquires whether they will sell, and requests them to be careful to deduct out his commissions on sales and re-shipments. *May,* 20, 1824, *Thomas & Martin* write to the defendants, stating, that if their goods could not be readily sold at two dollars per piece, they wish them returned by the first opportunity. In *August* the defendants reply, stating they had sold part of the goods, and will endeavour to sell the balance. *November* 12, 1824, *Thomas & Martin* write to the defendants enclosing *Hollinshead's* order for their goods, requesting remittance for sales made, and the return of the goods unsold. *January* 18, 1825, the defendants reply, that the sales are closed; and that they had rendered an account-current to *Hollinshead,* the 28th of *October,* which shews a small balance (two hundred and ninety-three dollars and six cents), in his favour, which they will hold subject to his orders.

*February* 19th, 1825, *Thomas & Martin* acknowledge the receipt of the defendant's letter of the 18th of January, and state, that from it they infer that the defendants made *Hollinshead* an advance on their shipment by the *Sally and Polly:* That *Hollinshead* is dead, and they therefore expect the defendants to unravel the mysterious business, as he had informed them he could not obtain an advance on their goods, but was obliged to sell two hundred pieces to pay freight, duty, &c: That they wish the defendants to forward copies of the account of sales, and any receipts of *Hollinshead* for moneys advanced on their goods: That they do not understand why *Hollinshead's* order, forwarded on the 11th of *November,* is not sufficient to justify payment of the balance, if not more than the proceeds of the six bales of goods; and that on receiving copies of the accounts, they hope *C. Hollinshead's* character, and that of their house, will stand unimpeached. They add in the postcript, that *C. Hollinshead* informed them, that he, by seve-

(Newbold *v.* Wright and Shelton.)

ral opportunities, had forwarded orders to the defendants, to account
to *Thomas & Martin* for the proceeds of the goods, soon after his
arrival from *St. Jago,* which was the reason of their not obtaining an
order from him sooner, which will more fully appear by reference to
his letters to the defendants of the 7th of *May* and the 12th of *No-
vember,* 1824.

*May* 19th, 1825, the defendants reply, stating that the accounts had
been forwarded to *Hollinshead* in duplicate: That they now send
copies: That it is not their fault if *Thomas & Martin's* interests
have suffered: That as, by their account-current they stand respon-
sible to *Hollinshead's* estate for the balance it exhibits, they cannot
transfer it to *Thomas & Martin* on the order sent, which did not
reach them until after they had accounted to him, and that had it
reached them sooner, they could only have accounted for the ba-
lance due after the liquidation of their advances.

The account of sales is dated the 30th of *September,* 1824.   Sales
of seven hundred and fifty-nine pieces Succatoons:

|  | | |
|---|---:|---:|
| Gross sales, | $1518 | 00 |
| Matting, | 12 | 00 |
|  | 1530 | 00 |
| Charges, | 86 | 65 |
|  | $1443 | 35 due on the average. |

*November* 1st, 1824.

The account-current, dated the 1st of *January,* 1825, between *C.
Hollinshead* and the defendants, showed a balance in his favour of
two hundred and ninety-three dollars and six cents.

*C. Hollinshead* wrote to the defendants *November* the 12th, 1824,
stating that he was pleased to hear they had sold all *Thomas & Mar-
tin's* goods, but had since learned they had sold but two hundred and
fifty pieces: That he had given *Thomas & Martin* an order for the
balance of their goods in the defendants' hands, and for the proceeds
of those sold, and requests the defendants to deduct five per cent com-
missions out of the sales, and two and a-half per cent if re-shipped,
and place them to his credit: That he was sorry Mr. *Archer's* goods
would not sell: That he wishes them to make up his account and
send it, as he wants to know the balance against him; and wishes Mr.
*Shelton* to send him the letter of credit he left with him when last in
*Cuba.*

*Jacob M. Thomas* and *James Martin,* members of the firm of
*Thomas & Martin,* commission merchants here, were examined on
the part of the plaintiff, who proved that the goods in question
belonged to the plaintiff at the time of the shipment:   That a lot of
goods, of which these were part, was placed in their hands by the
plaintiff for sale: That they had made an advance on them to the plain-
tiff, but had sold enough to reimburse their advance: That *Thomas &*

*Martin* had no interest in the shipment, which was made under the direction of the plaintiff: That the defendants have never paid them the balance of two hundred and ninety-three dollars and six cents: That *Hollinshead* stated he could get no advance on the plaintiff's goods, which was the reason for making sales at such a sacrifice to pay the freight, duties, &c., on the outward shipment: That *Hollinshead* received his instructions from them, as agents of the plaintiff: That they never communicated to the defendants that the plaintiff had any interest in the goods: That their correspondence with the defendants was communicated to the plaintiff, and received his sanction and approbation: That *Hollinshead* was dead, considerably insolvent, and that they could never find among his papers the accounts which the defendants stated they had sent.

The plaintiff gave in evidence the outward manifest of the *Sally and Polly's* cargo, dated the 26th of *April,* 1823.

The defendants read in evidence the deposition of *Thomas Brooks,* a clerk in the employ of the defendants. He stated that *Hollinshead* arrived in *St. Jago* in *May,* 1823, in the *Sally and Polly* with a cargo of provisions and dry-goods, consigned to the defendants: That from the list of the cargo, and from *Hollinshead's* not mentioning that any other persons were interested therein, he believed the cargo belonged to *Hollinshead:* That *Hollinshead* received the sum of six thousand and sixty-two dollars and seventy-three cents, an advance from the defendants, in cash and merchandize to himself, for repayment of which the goods were left in the defendants' hands, as per the list of goods and account-current: That *Hollinshead,* in his correspondence directed the defendants to sell the goods left: That in *December,* 1823, the defendants received an order from *Hollinshead* to deliver to *C. Bispham's* order part of the goods: That in the same month and year another order was received to account to *M. Burrough* for part: That in *November,* 1824, another order was received to account to *S. Archer* for part, which orders were accepted: That on the 27th of *December,* 1824, they received another order from *Hollinshead,* sent by *Thomas & Martin,* to account to them for the balance of six bales Moreas, left by him in the defendants' hands, which order could not be complied with, as the account of sales of these goods had been before rendered to *Hollinshead:* That the defendants owe *Hollinshead* or his representatives two hundred and ninety-three dollars and six cents, as per the account-current of *January* 1st, 1825: That the plaintiff never wrote to the defendants, nor the defendants to the plaintiff: That such copies of the defendants' letters to *Hollinshead* as the deponent could produce were annexed to the deposition: That the goods in question were always held and considered as the property of *Hollinshead* until the liquidation of all advances made, and they and their proceeds subject only to his order.

On his cross-examination he stated: That the defendants did not make the advance to *Hollinshead* on any one description of the merchandize remaining in their hands, separately and specifically, but

(Newbold *v.* Wright and Shelton.)

made the said advance, receiving as security therefor the whole of the remaining goods, which, by his order, were to be sold for his account and the liquidation of the said advance : That on *Hollinshead's* arrival in 1823, the only unsettled account between him and the defendants was one in which there was a small balance in his favour of one dollar : That the defendants, as commission merchants, were agents in a sale of produce to *Hollinshead* in 1823, and shipped by them by his order on board the brig *Union*, bound to *Philadelphia*, in *June*, 1823 ; for whose account the deponent does not know ; the invoice was attached ; the amount of the shipment, fourteen thousand eight hundred and eleven dollars and seventy-five cents, was charged to *Hollinshead* in the account-current of the 4th of *July*, 1823, as due that day : That it was never known to the deponent, nor as he believes to the defendants, that the goods in question were shipped by any other person than *Hollinshead*, unless *Hollinshead* might have stated verbally that others were shippers, of which the deponent had no recollection ; nor was there any positive information given, as the deponent believes, to the defendants, to cause them to know that the said goods actually belonged to any other person, or to whom they belonged, until the receipt of *Hollinshead's* order of the 31st of *October*, 1824, received the 27th of *December*, which stated that the goods belonged to *Thomas & Martin*, and were consigned to *Hollinshead* by them, and then for the first time directing the defendants to follow *Thomas & Martin's* directions relative to the said goods ; although the defendants had before received a letter from *Thomas & Martin* on the subject of the said goods, dated 5th *mo.* 21, 1824, which stated that *Hollinshead* had ordered the proceeds of sales to be remitted to them, but said nothing of their or any other person's property in said goods ; nor was any order of *Hollinshead's* so to account to them for them, ever received by the defendants until the one before mentioned, on the 27th of *December*, 1824 : That in the list of goods left by *Hollinshead* at his departure from *St. Jago*, in 1823, is written the name of *Thomas & Martin* over the description of the goods in question, from which circumstance the deponent inferred, that the said goods were received from *Thomas & Martin*, either through purchase or otherwise, but their right in the property was never made known specifically to the defendants until the transfer ordered by *Hollinshead* : That *Hollinshead* made no consignment of goods to the defendants after he left *Cuba* in 1823, except a small bill of castings amounting to one hundred and thirty-two dollars and twenty-eight cents ; and that *Hollinshead* took from the defendants a receipt for the goods left, of which a copy was annexed. The correspondence between *Hollinshead* and the defendants, and *Thomas & Martin* and the defendants was annexed to the deposition.

The accounts sales made by the defendants are headed, ' Account sales by *Wright & Shelton* of sundries received per schooner *Sally and Polly*, by order of C. *Hollinshead*, for account of all concerned.'

(Newbold *v.* White and Shelton.)

In account-current *No.* 10, under date of *March* 4, 1824, is an entry of charges on *Archer & Bispham's* goods.

The defendants also read the deposition of two witnesses, commission merchants of *St. Jago de Cuba*, who stated that it was the usage of trade there, for the resident merchants to make advances on merchandise and cargoes deposited with them for sale, and to sell the same for account of the person to whom the advance was made, and put the proceeds to his credit in account: That they treat the supercargo as the owner, and will not account to the foreign shipper without an order from the supercargo, and then only for the balance beyond the advance: That it was not the practice to ask supercargoes for invoices or letters of instruction; and that there are about eight commission houses at *St. Jago*, all of whom conform to this usage.

*Samuel Archer* was examined for the plaintiff, and stated, that in 1823 he shipped goods by the *Sally and Polly*, by C. *Hollinshead:* That they were placed in the defendants hands for sale: That they were sold for more than the limits, and the proceeds of the sale remitted, 3rd of *September* 1825, amounting to two thousand and eleven dollars and nineteen cents: That he thought he received no order from *Hollinshead* for his goods; no mention of any was made in the correspondence; it was probable *Hollinshead* wrote to the defendants to make sales: That he obtained no advances from the defendants; and did not think he authorized *Hollinshead* to take any advance.

The correspondence between *S. Archer* and *Hollinshead,* and between *S. Archer* and the defendants, was read, but is not material.

The Judge (after stating the evidence) says:—What is the character of the balance of six thousand and sixty-two dollars and seventy-three cents, due on the 5th of *July,* when the supercargo left the island? Was it his own debt, or contracted on the credit of the cargo? He had a letter of credit to some extent, as appears by his letter of the 12th of *November,* 1824; what its extent precisely was, does not appear. On the 5th of *July,* the shippers had full confidence in him. There was no suspicion, that appears, of his infidelity, or prospect of his subsequent death and insolvency. Did the defendants act fairly and *bona fide* in the course of trade? Was this a pledge for his own debt, or like the case of *Laussatt v. Lippincott,* in the Supreme Court, cited by the counsel, a deposit in anticipation of a sale, out of which the advances were to be repaid? It would seem to me it was not a pledge, but a deposit of that kind. The defendants certainly never trusted him on his personal credit for so large a sum. Supercargoes are generally young men, known to be of little or no property. Independently of usage, therefore, the case in this respect is favourable to the defendants; but I wish you carefully to examine *Backus* and *Chamberlain's* evidence, as to the course and usage of trade. If such a usage is proved, is it a reasonable

(Newbold v. White and Shelton.)

one ? Is it not like the usages of other places ?. You will judge for yourselves whether this usage is proved, and if it is, whether it be reasonable, and whether it be not conformable to the general mercantile usage' and course of trade. *Brooks'* evidence perhaps goes too far ; but supposing the defendants to have known the real character of *Clayton Hollinshead*, and the names of all the shippers, does it alter the case ? He was in their full confidence, he was their authorised agent, with the large powers of a supercargo. Might not the defendants consider him the proper person to raise and settle accounts with, and leave him to apportion and distribute among his principals ? Was there any privity independently of the specific orders between the shippers and the defendants ? Are their accounts true extracts from their books, made up as they bear date ; (for we must carry ourselves back to the 5th of *July*, 1823, and the other times mentioned on the face of the papers,) or were they made up from subsequent events ? In the absence of proof, if the defendants' characters are fair, they are to be presumed to have been regular and correct.

But orders were given and accepted in favour of several of the shippers. But independently of this, consider as I said before, if the defendants might not trust the supercargo to distribute the funds among the shippers, his employers. Consider the law. A factor cannot pledge, though his character is unknown to the pledgee. It is hard, but the law is so settled. Courts have struggled to get out of it, or to distinguish cases from its principle. Examine the cases cited from *Patterson* v. *Tash*, down, and *Laussatt* v. *Lippincott*, and the usage of trade. This it appears to me was no pledge, but a deposit, with power to sell according to that usage (if you find it to be one) not for payment of his own debt, but to reimburse advances made to him as supercargo. On the whole, if you are satisfied that the defendants acted fairly and *bona fide*, according to the usage of trade, as it existed at *St. Jago de Cuba*, or according to general mercantile usage and course of trade, they are justified in retaining the proceeds of the plaintiff's goods, and he is not entitled to recover the one thousand four hundred and thirty-one dollars and thirty-five cents which he claims ; unless you can discover something unmercantile in the defendants' conduct, something like fraud, something to deserve blame and censure.

He directed the jury if they found for the plaintiff for the balance of two hundred and ninety-three dollars and six cents, to give a verdict for that sum, with or without interest, subject to the opinion of the court, whether on the whole evidence the plaintiff was entitled to recover that amount. He charged on three points as requested by defendants' counsel :

1. That if the jury believe that the defendants acting *bona fide*, made advances at *St. Jago de Cuba* to *C. Hollinshead*, supercargo and consignee, on his depositing the goods in question with them for sale and payment of the advances, and that this was done in conformity with the usage of trade at that port, the defendants are entitled

(Newbold *v.* Wright and Shelton.)

to retain the goods and proceeds thereof for the payment of the advances so made.

2. That even if the defendants knew or suspected that there were several owners of the cargo, and made advances on the whole *bona fide*, in conformity with the usage of trade at *St. Jago de Cuba*, to *C. Hollinshead* as supercargo and agent of all the owners, and on their account, which advances were distributed by *C. Hollinshead* in proportions unknown to the defendants, the defendants properly accounted with *C. Hollinshead*.

3. That *Thomas & Martin* having acted throughout with the sanction and approbation of the plaintiff, he is bound by all their acts and omissions.

To this charge the plaintiff's counsel excepted and the judge sealed a bill of exceptions.

The jury found a verdict in accordance with the charge of the judge for the balance of two hundred and ninety-three dollars and six cents with interest, and the plaintiff sued out a writ of error.

The points made by the plaintiff's counsel on the trial were

1. That in point of fact no advance was made by the defendants on the plaintiff's goods.

2. That *Hollinshead*, the consignee, had no authority to take such an advance on the goods as this was alleged to be.

3. That the defendants knew *Hollinshead* was the agent and not the owner.

4. That after they knew it, they delivered goods and made payments to the other shippers, when if the advance was made as was alleged on the goods of all the shippers, it should have been borne rateably by all.

5. That the usage of trade relied on by the defendants had none of the requisites to constitute a good usage.

*J. L. Newbold* for the plaintiff in error.

1. The most material questions of fact were withdrawn from the jury ; these were, 1. Was there in fact any advance on the plaintiff's goods ? 2. If so, what was its character ? Was it a pledge by the supercargo for his own debt ? The plaintiff was entitled to the opinion and judgment of the jury on these points, which were purely questions of fact. The judge decides them both. He says, " This was no pledge, but a deposit for sale, not for payment of his own debt but to reimburse advances made to him as supercargo." He says it was like the case of *Laussatt* v. *Lippincott*, 6 *Serg. & Rawle*, 386, yet there it was expressly left to the jury to say whether the deposit was a pledge or sale.   *Work* v. *Lessee of Maclay*, 2 *Serg. & Rawle*, 415. *Hershey* v. *Hershey*, 8 *Serg. & Rawle*, 333.

The charge of the judge was confused, so as to leave the jury at a loss, which is error. *Selin* v. *Snyder*, 11 *Serg. & Rawle*, 319.  *Less. of Snyder* v. *Snyder*, 6 *Binn*, 498.  *Work* v. *Lessee of Maclay*, 2 *Serg.*

(Newbold *v.* Wright and Shelton.)

*& Rawle,* 417. Questions of fact and law are blended throughout the charge so as to render it difficult for the jury to distinguish between them. Both law and facts were decided by the judge, against the plaintiff; nothing was left to the jury. "The court should sum up the facts and submit them with the inferences of law; but care should be taken to separate the law from the facts, and leave the latter in unequivocal terms to the jury, as their peculiar province," says Judge STORY in *M'Lanaham* v. *U. In. Co.* 1 *Pet. Rep.* 182. The evidence we thought was decisive that there was in fact no advance, and that if there was, the advance was a pledge for *Hollinshead's* own debt, in either of which cases the plaintiff was entitled to recover. The judge took these questions from the jury and erred in doing so.

2. The judge erred in telling the jury, the plaintiff was bound by *Hollinshead's* act in obtaining an advance, and that the defendants were entitled to retain for payment of the advance. This brings up the question, can a factor pledge the goods of his principals? The judge admits in terms, that the law is settled that he cannot, but denies the present case to be within the rule. It is not necessary to inquire into the policy of this rule; it is sufficient to shew the law is, and has long been settled, and cannot now be altered, except by an act of the legislature. I shall cite the various cases, not to establish the rule, but to shew the nature of the cases to which it has been applied. The present case cannot be distinguished from some of them. The first case was *Patterson* v. *Tash,* 2 *Str.* 1178. Then followed, *Daubigny* v. *Daval,* 5 *T. Reps.* 604. *Newsom* v. *Thornton,* 6 *East,* 17. *Martini* v. *Coles,* 1 *Maule & Selw.* 140. This case is very similar to the present. *Shipley* v. *Keyser,* 1 *Mau. & Sel.* 484. 493. In this case the question was made whether sale or pledge, and decided to be a pledge. *Soley* v. *Rathbone,* 2 *Mau. & Sel.* 301. *Cochran* v. *Campbell, Id.* in note. *M'Combie* v. *Davies,* 6 *East,* 538. *S. C.* 7 *East,* 5. *Baring* v. *Correy,* 2 *Barn. & Ald.* 137. 143. 149. *Pickering* v. *Busk,* 15 *East,* 38. There are various cases in our own country. *Skinner* v. *Dodge,* 4 *Hen. & Mun.* 432. *Van Amringe* v. *Peabody,* 1 *Mason,* 440. *Urquhart* v. *M'Iver,* 4 *Johns. Reps.* 103. *Kinder* v. *Shaw,* 2 *Mass. Reps.* 398. *Evans* v. *Potter,* 2 *Gall.* 13. *Rodriguez* v. *Hefferman,* 5 *John. Ch. Rep.* 417. *Kennedy* v. *Strong,* 14 *Johns. Rep.* 128. *Buckley* v. *Packard,* 20 *John Rep.* 421. This case is very much like the present. The plaintiff, a merchant in *New York,* consigned goods to the master of a vessel bound to *Havanna.* The master at *Havanna* delivered them to the defendants, commission merchants there, for sale. The defendants sold, and retained the proceeds to indemnify themselves, for advances made to the master. The plaintiff recovered. There are some later cases in the *English* books, in all of which the doctrine is recognized, and continued to be until the act of parliament changing the law in 1825. *Peet* v. *Baxter,* 2 *Eng. Com. L. R.* 472. *Fielding* v. *Kymer,* 6 *Id.* 295. *Kuckein* v. *Wilson,* 6 *Id.* 480. *Barton* v. *Williams,* 7 *Id.* 145. *Queiroz* v. *Trueman,* 10 *Id.* 103. *Sterneld* v. *Holden,* 10 *Id.* 260. *S. C.*

(Newbold *v.* White and Shelton.)

21 *Id.* 422. *Greenway* v, *Fisher*, 11 *Id.* 362. *Sellick* v. *Smith*, 13 *Id.* 66. *Blanay* v. *Allen*, 14 *Id.* 385. But it may be said the case of *Laussatt* v. *Lippincott*, 6 *Serg. & Rawle*, 386, is an answer to all this array of authorities. There the doctrine that a factor cannot pledge was recognized. That case was very different from the present. That was a case of sale, so found by the jury. There is no analogy between the cases.

3. The usage of trade set up cannot help the defendants. It is contrary to a long established, well settled rule of law. That this cannot be, is settled by authority. *Frith* v. *Barker*, 2 *John. Rep.* 335. C. J. KENT, says, " although usage is often resorted to for explanation of commercial instruments, it never is nor ought to be received to contradict a settled rule of commercial law." *Collings* v. *Hope*, 3 *Wash. C. C. Rep.* 149. *Edie* v. *East In. Co.* 2 *Burr.* 1216. It cannot be supposed the plaintiff knew of such a usage when he shipped his goods; if not known, there is no equity in his being bound by it.

*Meredith* and *Dunlap*, for the defendants in error.—It is not error for the judge to give his opinion on matters of fact, provided he leaves them to the jury. He did in this case leave the facts to the jury. Was the cargo deposited with the defendants for sale? Was an advance made by them on the cargo? Was that advance made *bona fide*, and in the usual course of trade? These were questions of fact, and were left to the jury. Whether the transaction amounted to a *pledge*, or a *sale*, or *quasi sale*, was (the facts being found by the jury) a question of law; and the same question which was decided in *Laussatt* v. *Lippincott*. The judge followed that case strictly. There were however two circumstances in the present case, which rendered the question of *pledge* or *sale* immaterial, *viz.* 1. That the plaintiff had instructed *Hollinshead* to pursue the very course which he did pursue; and 2. That he subsequently ratified his acts. *Robinson* v. *Justice*, 2 *Penn. Rep.* 23. *Graham* v. *Graham*, 1 *Serg. & Rawle*, 330. *Renn* v. *Penn. Hos.* 2 *Serg. & Rawle*, 413. *Poorman* v. *Smith's exors.* 2 *Serg. & Rawle*, 464. *Riddle* v. *Murphy*, 7 *Serg. & Rawle*, 237. *Johnston* v. *Gray*, 16 *Serg. & Rawle*, 361. *Roberts* v. *Ogilvie*, 9 *Price*, 269. *Doug.* 492. 1 *Mason*, 270. *Bredin* v. *Dubarry*, 14 *Serg. & Rawle*, 27. But if there had been no such instructions, and no ratification, still the plaintiff would not be entitled to recover in this action. He shipped goods (in common with several other shippers) as part of a general cargo, of which *Hollinshead* appeared to the world as the sole owner. The defendants had no notice that any other person was interested in them. The goods were really shipped for *sales and returns*. *Hollinshead* obtained an advance on the whole cargo, and with that advance shipped the return cargo. He distributed that return cargo among his principals, in what proportions the defendants did not, and could not know, even if they had known that *Hollinshead* was merely an agent. Eighteen months

(Newbold *v.* Wright and Shelton.)

after leaving the island, *Hollinshead* gave orders to *Bispham, Archer*, &c. for goods left in the defendants' hands. Those orders were honoured. *Thomas & Martin*, whose acts are admitted to be the acts of the plaintiff, afterwards obtained an order on the defendants to account to *them*, when the goods should be sold and the accounts made up. *Thomas & Martin* had ratified the intermixture made by *Hollinshead* of the interests of all the shippers, by making the settlement with him for the two hundred pieces of Moreas which had been sold, and the circumstances under which that settlement was made. When advised by the defendants of the final sales, and of the state of *Hollinshead's* account, *Thomas & Martin* questioned the *fact* of his having obtained advances to so great an extent, but not his *right* to obtain them. Under the circumstances, the defendants were in law bound to, and in fact could account to *Hollinshead*, and to no other person. *Pinto* v. *Santos, 5 Taunt.* 447. 1 *Eng. Com. Law Reps.* 152.

Again, the course of the factor in this case was precisely similar to that which was held legal by this court in *Laussatt* v. *Lippincott, 6 Serg. & Rawle*, 386, being according to the course of trade. Here, the usage of trade in the Island of *Cuba* was proved to be the same.

Again; the doctrine that a factor cannot pledge to a party who deals *bona fide* in the transaction, is not law in *Pennsylvania.* In *Laussatt* v. *Lippincott*, the principle laid down in the modern *English* cases, was indeed admitted by the court, but a nice distinction was taken, in order to relieve that case from the operation of the rule. The authority of the case is limited to the point decided, *viz.* that an agent may deposit his principal's goods for sale, and take an advance on them in the usual course of trade.

The general commercial law of *Europe*, protects every man in dealing *bona fide*, by pledge or otherwise, with a factor. 2 *Kent's Comm.* 628. The principle of the common law is the same. In *Wright* v. *Campbell* (4 *Burr.* 2046. S. C. 1 *Bl. Rep.* 628), decided in 1767, the transaction was a pledge by the factor for his own debt, although in form a transfer of the property by indorsement of the bill of lading. Lord MANSFIELD and the whole court held, that the party taking the pledge was protected, provided he had acted *bona fide*, and a new trial was granted for the purpose of having that fact found. The loose note of *Patterson* v. *Tash* (*Stra.* 1178) was cited on the argument of *Wright* v. *Campbell*, and disregarded by the court. The law stood then, at the time of the decision of *Daubigny* v. *Duval* (5 *T. R.* 604) upon *Wright* v. *Campbell*, and in conformity with the commercial law all over the world. The unfortunate disposition to shake Lord MANSFIELD's reputation, which prevailed in the court of K. B. for some years after his death, is notorious. It was that disposition which induced the court to take the fatal step, in *Daubigny* v. *Duval*, of over-ruling *Wright* v. *Campbell*, and on the loose authority in *Strange*, laying down the rule that a factor cannot pledge. It has since been ascertained that Lord Chief Justice LEE's

(Newbold *v.* Wright and Shelton.)

decision in *Patterson* v. *Tash* in *Strange*, was by a mistake of the printer entirely mis-stated. The decision in that case was that a factor *can* pledge. The printer misprinted it " *cannot.*" Lord Chief Justice LEE in fact had decided the question in conformity with common sense, and in the same manner that Lord MANSFIELD afterwards decided it. The same case of *Patterson* v. *Tash*, upon the same facts, had been heard in Chancery before Lord HARDWICKE, (9 *Mod.* 397) who refused to interfere, declaring that the course pursued by the factor in that case was legal, that the party so dealing with him was protected, and that it was the common practice and had been repeatedly so decided in Chancery. This decision of Lord HARD-WICKE, by a mistake of the Index maker, escaped the notice of court and counsel in all the subsequent *English* cases, and has never been cited until now.

Lord MANSFIELD, Lord HARDWICKE and Lord Chief Justice LEE, then, all agreed on this question, and *Daubigny* v. *Duval* was really decided in opposition to all of them, although the blunder of a printer had apparently thrown Ld. Ch. Just. LEE's authority into the opposite scale, and the blunder of an Index maker, had prevented Lord HARDWICKE's opinion from coming to the notice of the court. *Daubigny* v. *Duval* was followed by many subsequent *English* cases, which threw the commercial community into such confusion that it became necessary to pass an act of parliament (2 *Kent's Comm.* 628, *note*) to restore the law to its former state. The late *English* cases were followed in *New York*, and a similar act of assembly was found necessary there. They have never been yet followed in *Pennsylvania*, and it is trusted, never will be, since the blunders in which they originated have been since exposed.

Again—there is a marked distinction to be traced between the powers of an ordinary factor, and those of a *supercargo*. *Hollinshead* was a supercargo, and of his power even to pledge, there can be no doubt. Thus a supercargo may change the destination of the goods in his charge, (4 *Camp.* 183. 2 *Camp.* 529). An ordinary factor cannot, (12 *East,* 381). A supercargo may substitute another factor, (2 *Bos. & Pul.* 438) ; a factor cannot (2 *Mau. & Sel.* 298). A supercargo may sell at less than the limited price (3 *W. C. C. Rep.* 151. 4 *Binn.* 362), which a factor is not justifiable in doing. A supercargo may exercise a general discretion, which a mere factor cannot do, where he has instructions (4 *Binn.* 362. 2 *Mod.* 100). A supercargo has the entire control of his principal's goods in his charge (12 *East,* 381), which a mere factor has not. Nothing but fraud will make a supercargo even liable to his principal (6 *S. & R.* 300), far less invalidate his contracts with third persons. Finally, a supercargo may pledge (*Evans* v. *Potter,* 2 *Gall.* 13) ; " he may lawfully pledge," says Judge STORY, " for any thing in the ordinary course of trade." And the same principle is laid down in *Merrick* v. *Bernard,* 1 *W. C. C. Rep.* 479.

In most of the cases which appear against us, there was know-

(Newbold *v.* Wright and Shelton.)

ledge or fraud in the party dealing with the factor. In the argument they cited the following cases. 4 *Hen. & Munf.* 432. 1 *Mason,* 440. 4 *Johns.* 103. 2 *Mass. Rep.* 398. 14 *Johns.* 128. 20 *Johns.* 421. 4 *Camp.* 60. 2 *Esp.* 557. 4 *D. & N.* 648. 1 *Esp.* 111. 15 *East,* 400. 1 *Vez. & B.* 202. 1 *Wash.* C. C. R. 174. 3 *W. C. C. Rep.* 151. 1 *Wash.* C. C. R. 479. B. *N. P.* 130. 18 *Johns.* 24. 2 *Serg. & Rawle,* 417. 8 *Serg. & Rawle,* 335. 11 *Serg. & Rawle,* 319. 6 *Binn.* 498. 491. 1 *Peters,* 182. 9 *Serg. & Rawle,* 202. 11 *Serg. & Rawle,* 134. 3 *Binn.* 80. 1 *Serg. & Rawle,* 72. 176. 330. 2 *Serg. & Rawle,* 70. 413. 464. 3 *Serg. & Rawle,* 500. 4 *Serg. & Rawle,* 442. 2 *Str.* 1178. 5 *T. R.* 604. 6 *East,* 17. 1 *Mau. & Sel.* 140. 484. 2 *Mau. & Sel.* 298. 7 *East,* 5. 2 *Barn. & Ald.* 137. 15 *East,* 38. 10 *Com. Law Rep.* 260. 21 *Com. Law Reps.* 422. 1 *Ry. & Moody,* 219. 2 *B. & B.* 639. 2 *Com. Law Rep.* 472. 6 *Com. Law Reps.* 480. 7 *Com. Law Reps.* 145. 10 *Com. Law Reps.* 103. 11 *Com. Law Reps.* 262. 13 *Com. Law Reps.* 66. 14 *Com. Law Reps.* 385.

*Chauncey* in reply.—The questions presented in this cause are of great commercial interest. The plaintiff made a shipment of goods consigned to a supercargo with special instructions. The consignee in the foreign port was well known to be a supercargo, and as appears by the evidence, so known to the defendants by former transactions. He presented himself to the defendants with a cargo, belonging to different shippers, as must have been known to the defendants, and to defray incidental expenses, he sells part of the cargo at a sacrifice. He was owner of part of the cargo himself. He placed that with the goods of several of the shippers in the hands of the defendants for sale. He received an invoice of sugar, coffee, &c. from the defendants and came with it to the *United States.* The allegation of the defendants was that he received this as an advance on the goods placed in their hands, and that they were entitled to reimbursement from the sales of the goods.

The judge charged that this was a deposit in anticipation of a sale, and not a pledge for his own debt: That independently of usage this made the case favourable to the defendants: That if the defendants acted *bona fide,* and according to the usage of trade at *St. Jago,* or general usage, they were entitled to retain. We contend, that the fact of the advance and the character of it, were for the jury and should have been so put to them : That usage was a mixed question ; whether there was usage, and what it was, for the jury— what its effect, for the court: That no usage, to be regarded in point of law, was proved at all; and that the charge as to good faith and usage, is not sustainable in law.

1. If the judge's meaning is apprehended it is, that this was a deposit and not a pledge, and assuming this, that if they believed the defendants acted fairly and *bona fide* in the course of trade, they were enti-

(Newbold *v.* Wright and Shelton.)

tled to retain. If he did thus assume, he invaded the province of the jury in a very nice and difficult question.

As to the fact of the advance and nature of it, the whole rested on the testimony of *Brooks,* the defendant's clerk, who does not venture to assert it, but in the faintest manner. The evidence was powerfully strong against it. Two hundred pieces of the plaintiff's goods were sold at a loss to pay duty freight, &c.

The accounts shew the advance was on the supercargo's own property, the sales he had made and the letter of credit he left behind him.

Was not this a pure question of fact which the judge ought to have left to the jury ? He did not leave it to them because he makes an assumption on which he founds a direct charge.

2. If the judge did not assume this fact, he so presented it to the jury as to give it the aspect of a question of law. " Was this a pledge for his own debt, or like *Laussatt* v. *Lippincott,* a deposit for sale ? It would seem to me it was not a pledge." The conclusion he arrives at is a legal conclusion. It is said the jury have found on this question. It is in the power of no man on this charge to say what the jury have found. They had no distinct question presented to them. They had no precise direction or instruction in point of law, and they were left really without a guide, but with the opinion of the judge on both law and fact against the plaintiff.

3. The charge of the judge is to be gathered from the answers to the questions proposed. The case he puts is, knowledge by the defendants that *Hollinshead* was an agent; good faith on the part of the defendants; and an advance according to the usage of trade. This being supposed, he says, the defendants were entitled to retain. We contend he erred in point of law. The general rule of law that a factor cannot pledge the goods of his principal, cannot be questioned. If the defendants knew the agency and the instructions, they were bound by them. If they knew the agency, but not the particular instructions, they had no right to treat him as the principal in the disposition of the property. The supercargo is a factor, with no greater powers than a resident factor. There is one rule for both. Necessity may produce a new rule, and is more likely to arise in the case of a supercargo than in that of a resident factor. The cases cited do not bear out the distinction attempted to be shown between supercargoes and factors.

But it is supposed the judge derives aid from usage. This is not a subject of usage but of law. The attempt is to establish a usage which mocks all law. This usage is made by eight men, who make it to suit exactly their own interest; and two of them testify to it. I understand that usage of trade, a course of dealing, may be resorted to to explain a commercial instrument; but not to set aside a rule of law. It may be resorted to to show an agent has conducted himself according to it, never to vindicate a breach of his instructions. *Frith* v. *Baker,* 2 *John. Reps.* 335.

(Newbold *v.* Wright and Shelton.)

As to general mercantile usage to which the judge refers, there was not a particle of evidence. It was not even asserted that any existed. What is there to justify the charge " that if the defendants acted *bona fide* and according to usage, they were entitled to retain ?"

The law being that a factor cannot pledge, the plaintiff was clearly entitled to the benefit of it in this case. It was a pledge for the factor's own debt. The cargo was not looked to for security. The accounts speak a language irreconcilable with the defendants' allegation. They are headed, " for account of all concerned." Half commissions are credited to *Hollinshead.*

The judge says the case comes within *Laussatt* v. *Lippincott.* Can two cases be more unlike ? There the broker took the goods to an auctioneer, committed them to him for sale, and received a note in anticipation of the sale, and this according to the course of trade. Here, the supercargo left the plaintiff's goods for sale, but never received a dollar of advance on them. It was essential to the defendants' case to show that he did receive an advance. If *Hollinshead* had received an advance in coffee, it was within his instructions. It has been argued that he did, as the invoice of the return cargo consisted partly of coffee; but the evidence wholly negatives that it was for the plaintiff. The ground taken by the defendants here is inconsistent. They say the supercargo had express authority to take an advance ; yet they prove they never saw or heard of the instructions; that they only knew *Hollinshead.*

If the defendants had shewn the advance on the plaintiff's goods agreeably to the authority given, the case would have been with them.

The defendants were accountable, after they received notice of the different interests, for a fair distribution. They certainly knew in *June,* 1824, of *Thomas & Martin's* interest, yet long after they pay Mr. *Archer* for his goods, and retain the plaintiff's only. *Pinto* v. *Santos,* 5 *Taunton,* 447. (1 *Eng. Com. Law Reps.* 152.)

But it has been said, that the plaintiff affirmed the transaction. There is nothing like this in the correspondence, or in the evidence given.

ROGERS, J.—This was an action of *assumpsit* to recover the proceeds of certain goods, which were sold by the defendants, who were commission merchants in *St. Jago de Cuba,* on account of the plaintiff.

The plaintiff, through *Thomas & Martin* commission merchants, made a shipment with others, in the schooner *Sally and Polly,* which they consigned to C. *Hollinshead,* the supercargo, with a letter of instructions to sell the goods to the best advantage, as soon as the market would admit, and remit the proceeds in good bills, specie, or coffee ; to sell for cash or a short credit. He then adds, that if the goods could not be sold during his stay, he should put them in the

hands of a house of respectability, and obtain an advance of one half, or two-thirds of the value in coffee.

*C. Hollinshead* arrived in *St. Jago de Cuba*, the port of destination, in *May*, 1823, and left there for the *United States*, about the 5th of *July*, 1823; and being unable to sell the goods, according to his instructions, he left them, as he was directed, in the hands of the defendants.

*Wright and Shelton*, the defendants, by order of *C. Hollinshead*, on the 19th of *June*, 1823, shipped on board the brig *Union*, on account of whom it might concern, property, consisting of sugar, coffee and molasses, amounting to fourteen thousand eight hundred and eleven dollars and seventy-three cents.

A copy of an account-current, was also exhibited in evidence, dated the 4th of *July*, 1823, shewing a balance against *C. Hollinshead*, of six thousand and sixty-two dollars and seventy-three cents.

The defendants allege, that the shipment on board the brig *Union*, was received as an advance on the goods placed in their hands for sale, and that they are entitled to be reimbursed the balance above stated, from the sale of the goods.

The plaintiff denied the fact, that the advance was taken on the goods belonging to the plaintiff, and the other shippers.

He also contended, that if the supercargo did take such an advance, he had no authority to do so: That the defendants knew the goods were his, and that after they knew this, they delivered goods, and made payments to other shippers, when if the advance was made on the goods, it should have been borne rateably by all.

The first it will be perceived, was a material point in the cause. It is obvious that if the money was not advanced on the credit of the goods, the defendants have not a pretence for saying, that they are entitled to reimbursement from that fund, for a debt due from the supercargo himself. In order to show that this was a transaction between *C. Hollinshead* and the defendants, without any relation to the goods placed in deposit, various documents were given in evidence, which have been fully examined by the counsel, in the course of the argument. They have also contended, that if there was any agreement, about an advance, which they denied, it was in reference to the shipment made and owned by *Hollinshead* himself. As the court thinks this cause requires a rehearing, it is not my intention to express any opinion on the weight of the evidence. I will barely observe, that it is by no means clear, that any advance was ever made on the credit of the goods owned by the shippers, other than those of *C. Hollinshead* himself, and for the repayment of which, the goods were deposited for sale in the hands of the defendants. Although this fact is proved by one witness, the documents would seem to speak a different language. This material fact, the plaintiff complains, was withdrawn from the jury. I have examined the charge with great care, and I cannot consider it otherwise than as a binding direction

(Newbold *v.* Wright and Shelton.)

in law and in fact, favourable to the defendants.   The jury could not have found otherwise, than for the defendants, with such a direction, without disrespect to the plain intimations of the court.   The judge instead of leaving the fact of the advance to the proper tribunal, charges the jury, that if they are satisfied the defendants acted fairly, and *bona fide,* according to the usage of trade, at *St. Jago de Cuba,* or according to general mercantile usage and course of trade, they are justified in retaining the proceeds of the plaintiff's goods; and that he is not entitled to recover, &c. unless the jury can discover something unmercantile in the defendants' conduct, something like fraud, something to deserve blame or censure.

As to a general mercantile usage and course of trade, no evidence whatever was given ; it is not pretended that there was; the court refer in the charge to the usage peculiar to *St. Jago de Cuba,* which was proved by two of the witnesses.   If we are to credit them, it is the usage at that place, to make an advance on merchandize, deposited by supercargoes with commission merchants for sale; and to treat the supercargo as the owner of the goods.   If so, according to the usage there, a factor, contrary to the general mercantile usage and course of trade, has a right to pledge the goods of his principal for his own debt, and in short, to do any other act which a principal might lawfully do, in the disposition of his own goods.   It is perfectly immaterial whether the fiduciary character of the supercargo, be known to the commission merchants or not, or what may be the nature and extent of his instructions, or whether those instructions be known to them or not.   They treat him in all respects as the owner of the goods.   This then, is the usage which the court has thought proper to leave to the jury, with directions that if the jury believed such a usage did exist, they should find for the defendants.   This usage, (although very convenient doubtless to the commission merchants of *St. Jago de Cuba*) in its utmost latitude, is not contrary to the law of this state, but, it is admitted, that it is in opposition to the law of every mercantile country; for notwithstanding the elaborate arguments of the defendants' counsel, I am not permitted to doubt, that it is the well established law of this state, of our sister states, and of England, that though a factor may sell and bind his principal, he cannot pledge the goods, as a security for his own debt.   The principal may recover the goods of the pawnee; and his ignorance that the factor held the goods in the character of factor is no excuse. The principal is not even obliged to tender to the pawnee the balance due from the principal to the factor, for the lien which the factor might have had for such balance is personal, and cannot be transferred by his tortious act, in pledging the goods for his own debt.   The rights of principal and factor depend on the *law merchant,* which has been adopted by the common law.   A factor is but the attorney of his principal, and he is bound to pursue the powers delegated to him. If the pawnee will call for the letter of advice, or make due inquiry, as to the source from whence the goods came, he can discover that

(Newbold *v.* Wright and Shelton.)

the possessor held the goods as factor, and not as vendor, and he is bound to know at his peril, the extent of the factor's power.   It may sometimes be a doubtful question, whether the transaction amounts to a sale, or a mere deposit, or pledge, as collateral security for a debt.   But when it appears that the goods were really pledged, it is settled that it is an act beyond the authority of the factor, and the principal may look to the pawnee.   There may, and have been, different opinions expressed in the books, as regards the policy of this rule, but however that may be, I agree with the Chief Justice in *Laussatt* v. *Lippincott,* that the principle, that a factor cannot pledge the goods of his principal, is too well settled to admit of dispute.   On the European continent it would seem a different rule in some respects prevails. There, possession constitutes title to moveable property, so far as to secure *bona fide* purchasers, and persons making advances of money, or credits on the pledge of property, by the lawful possessor.   I understand the rule on the continent to be, that a purchaser or pawnee, without notice, will hold the property against the principal, and in that, it differs from the rule of common law, where want of actual notice is immaterial.   The usage at *St. Jago de Cuba* goes to a greater extent than on the continent of *Europe,* for the witnesses state their custom to be, for the commission merchants to treat the supercargo as owner, without any regard to the extent or nature of his instructions, and whether they have notice of them or not.   Such usage should have every requisite to give it validity.   A custom or usage, to make it obligatory must be ancient (sufficiently so at least to be generally known), certain, uniform and reasonable.   A usage of so doubtful an authority, as to be known to but few, cannot be regarded.   *Collings & Co.* v. *Hope,* 3 *Wash. C. C. Rep.* 149.

When this usage commenced we have not been informed.   It is not proved to have been ancient, or sufficiently so to be generally known.   It was made by eight men to suit their own convenience, and has been proved by two of them.   That it is unknown to the mercantile community in this state is very certain.   That it was known to the shippers is not pretended.   It does not possess a single requisite to constitute a custom.   The shippers relied on the *law merchant,* in which it is clear that a supercargo is bound by his instructions.   They authorized him in a certain event, to employ a commission merchant, whom they must also have supposed would be bound by their instructions.   A factor may lawfully do whatever the usage and course of trade requires; and indeed, unless his orders restrict him, he is bound to conform to the course of trade.   *Evans* v. *Potter.* 2 *Gall.* 13.   But this is not a usage and course of trade. It is a local custom, peculiar to that place, made for the convenience of eight persons, in opposition to the laws, as it is known, in all commercial countries.   It is not for them to prescribe rules to regulate commerce, except as among themselves.   They must conform to the general commercial code.   So far from this case turning on the usage of *St. Jago de Cuba,* we are of the opinion it should be thrown entirely

out of the question. It would be of pernicious consequence to the commercial world, to recognize such a custom, so proved, made for the benefit of a few, opposed as it is to the general mercantile law. It is an attempt to set up a custom in opposition to a general principle of law, which cannot be permitted.

It has been further contended, that this case is similar in principle to *Laussatt* v. *Lippincott*, 6 *Serg. & Rawle*, 386, and the learned judge seems to have been of this opinion. I am so unfortunate as not to be able to discover the resemblance. In *Laussatt* v. *Lippincott* it was decided, that if a merchandize broker to whom goods are delivered by his principal, with power to sell, deliver and receive payment, deposit them in the usual course of business, with a commission merchant, connected in business with a licensed auctioneer, who advances his notes thereon, the deposit binds the principal, who cannot recover the value of the goods in an action of trover. The court considered this as an advance in anticipation of a sale, and justified by the uniform course of trade. Business to an immense amount, say the court, has been transacted in this manner, and the usage being established, it follows that when the plaintiff authorized his broker to sell, he authorized him to sell according to the usage, and when the defendants dealt with the broker, if they had known the coffee was not his own, they had a right to consider him as invested with power to deal according to the usage. In *Laussatt* v. *Lippincott*, both parties were acquainted with the usage, or were presumed to be so. But supposing the usage to exist, it is not pretended that Mr. *Newbold* knew of it; he cannot, therefore, with any propriety be said to have authorized the supercargo to deal according to the usage. In this the analogy fails. It is acknowledged to be of the first impression, for there is no case, as the Chief Justice says, exactly like it in the books. Without intending to cast the least doubt on the case, I do not feel disposed to extend the principle much further. If this had been clearly shown to be an advance in anticipation of a sale, on the plaintiff's goods alone, and the interest of the different shippers had been kept entirely distinct, there would have been some show of reason in likening it to *Laussatt* v. *Lippincott*. I am prepared to say, which is in analogy to the case, I would not protect a foreign broker or commission merchant in an advance so made. But what authority had the supercargo or sub-agent (for *Wright & Shelton*, can be regarded in no other light), what authority had they to intermix the interest of the shippers, by a general deposit of their goods in the hands of the defendants, to secure a general advance, even if it were made in anticipation of a sale. The case of *Laussatt* v. *Lippincott* does not sanction this, nor has any case been produced which does. It is in fact, making one man's goods liable for another man's debts, the justice and policy of which I have yet to perceive. This is beyond the power of a supercargo, or any other factor or agent. In *Shipley et at* v. *Thymer et al*, 1 *Maul. & Selwyn*, 484, it is said to be contrary to the duty of a factor to complicate the property of one with that of

other proprietors, in one general advance taken on the whole cargo. If we look to the letter of instructions by which the defendants are bound as well as the supercargo, we cannot perceive any such authority, and I am confident no prudent merchant, except under very special circumstances, would give such authority.    The shipments in a general ship, are entirely distinct, although consigned to the same person.    It is the duty of the consignee to keep them distinct; to open accounts against each owner.    If we should yield to a different practice it would lead to great complexity in business, and as I verily believe, to innumerable frauds.

This case presents a singular feature.    The defendants say, that they made a general advance, on a general deposit of goods owned by different shippers, and yet after they were aware of the fact of the ownership (as the plaintiff says), they paid the full amount of the proceeds of sale to several shippers, and now wish to be reimbursed for their general balance from the goods of the plaintiff alone.    This would mete out a hard measure of justice to the plaintiff.    If his goods are liable, they can only be rateably so.    The goods of the other shippers were also liable, and it was the duty of the defendants to retain their proportion out of the proceeds of sale.    It will be perceived, that I have considered the supercargo as a factor, and so far as regards this case, I cannot understand how he can be viewed in any other light.    He is as much bound by his instructions as any other factor.    He can justify himself in deviating from them, only in cases of necessity, some of which have been cited by the defendants' counsel.    The defendants also it must be observed, are sub-agents, and not purchasers.

It has been also urged, that the plaintiff cannot sustain this suit. As he was the undoubted owner of the goods, and the money has not been paid over, I can perceive no difficulty in the way.

Huston, J.—After the fullest consideration, I have not been able to concur in the opinion of the majority of the court, either in the view taken of the facts, or the law of this case ; and after repeatedly reading every word of the testimony in this voluminous record, I have concluded that the one half of the facts must be lost sight of, before the questions argued before us can arise.    I am aware that each party selects and argues on what he supposes are in his favour.    I have endeavoured to make up my mind on the whole of the case.

In *April*, 1823, *Thomas & Martin*, commission merchants in this city, having goods of the plaintiff's, put them on board of the schooner *Sally* consigned to *C. Hollinshead*, supercargo, *viz.* six bales of blue Moreas, containing nine hundred and sixty pieces, the value including the charges, two thousand seven hundred and nine dollars and twenty-four cents.    Their letter of instructions directed *Hollinshead* to sell to the best advantage, as soon as the market would permit, and to remit in good bills, specie or coffee; to sell for cash, or on short credit, and adds, *if the goods could not be sold during his stay, to put them*

(Newbold *v.* Wright and Shelton.)

*in the hands of a house of respectability, and obtain an advance of one half or two-thirds in coffee.*   Six or seven other merchants shipped goods in the same vessel consigned to the same supercargo.   What their instructions were does not appear, except *S. Archer's* which is similar to the above; to get an advance on the goods in sugar or coffee.   *Hollinshead* was obliged to sell part of the cargo to pay freight and duties, which it seems amounted to four thousand three hundred and thirty-six dollars.   He sold part of the plaintiff's goods; two hundred pieces to pay part of the freight and duty *on the whole cargo,* as he informed *Thomas & Martin* on his return. (See their last letter to the defendants.)   During his stay the defendants sold part of the cargo.   He had letters of credit on which he drew bills for about seven thousand dollars, and got an advance on the unsold goods from the defendants for above six thousand dollars, and sent the goods thus purchased to this city.   They left *St. Jago* in *June,* 1823.   Of this there was one thousand three hundred and sixty-seven dollars and fifty-six cents in coffee; the rest in sugar, and some molasses; in all fourteen thousand eight hundred and eleven dollars.   On the 23rd of *June,* the invoice is made out of those goods shipped by order of *C. Hollinshead* on account of whom it may concern.   There is nothing to show whose goods had been sold to pay the freight and duties, of four thousand three hundred and thirty-six dollars; and up to this time I have not been able to ascertain that *Wright & Shelton* had any knowledge of who was the owner of a single article of the outward cargo; and *Brooks,* the clerk of *Wright & Shelton,* swears he did not know, and he believes his employers did not.   After this return cargo had sailed, on the 4th of *July, Hollinshead* receives the account-current shewing a balance against him of above six thousand dollars; and on the same day makes and leaves with them a list of the merchandise left with them to be sold by them and *make returns,* and I suppose kept a copy.   At the same time he writes a letter in which he refers to the list of *goods to be sold on my account.*   Taking the list and letter as one and connected, it was a matter to be transacted on his account, and returns to be made to him.   In the list however there was a matter relied on by the plaintiff; it stood thus:

| | | | |
|---|---|---:|---:|
| 300 barrels of flour at | | $17 | $5100 |
| 3 bales Madrass hkfs., 100 pieces each bale, 300 pieces at 9 | | | 2700 |
| 1 bale Ventepolam hkfs. 100 at | 4 50 | 450 | |
| 17 rolls floor matting at | 12 | 204 | |
| | | | 3354 |

*S. Archer.*

| | | | |
|---|---|---:|---:|
| 2 trunks Madrass hkfs. 50 pieces each 100 at 9 | | 900 | |
| 1 bale    do. | 100 | 900 | |
| | | | 1800 |

*Charles Bispham.*

10,254

(Newbold *v.* Wright and Shelton.)

| | | | 10,254 |
|---|---|---|---|
| 1 trunk Madrass hkfs. 61 pieces at | 9 | 549 | |
| 1 bale Meesulapotam 100 pieces at | 4 | 400 | |
| | | | 949 |

*Marmaduke Burrough.*

| | | |
|---|---|---|
| 760 pieces Succatoons at | 2½ | 1900 |

*Thomas & Martin.*

$13,103

From the names written under certain parcels it was inferred that notice was given to *Wright & Shelton,* who were the owners of the several parcels of merchandize; and from the direction to them to retain for him two and a half per cent. commission, there was also notice that *C. Hollinshead* was supercargo and not owner. The first conclusion is denied, and *Brooks* swears it was not so considered or understood, and might be a mark of whom he got the goods from; but as he sent home a cargo sufficient to pay them all, they could not know to whom he would or would not deliver the return cargo, and were not bound to know. The defendants admit they knew he was a supercargo, but say, as the owners had trusted him to bring and to make returns, they were not bound to make any inquiries, or to know how the matter was settled on *Hollinshead's* return. The oath of *Brooks* is positive, that the advance was on the whole goods left, and not so much on each parcel. *Hollinshead* returned immediately after the 4th of *July,* and was here early in *August.* How the return cargo was disposed of does not appear. The defendants sold the flour as appears by their accounts for less than seventeen dollars; some for sixteen per barrel, it produced about

$4786 50
deduct charges  259 26
———————
$4527 24

They also sold part of the other goods (not *Thomas & Martin's*) as appears by the several accounts among the evidence; and by comparing the articles sold with the above list of articles, it will appear they sold part of those above the name *S. Archer,* part of those above *C. Bispham,* and part of those above the name *M. Burrough,* none of whom, so far as we know, ever objected, and all of whom got the proceeds of the remainder on the order of *Hollinshead,* and none of whom asked for any thing from the defendants until they severally had *Hollinshead's* order.

Several exceptions are taken to the charge, but which in fact amount to only two. In the first place, it is apparent the charge has not been treated fairly. What is sent here is the abstract or notes from which to charge the jury, containing to be sure the points of law stated to the jury, but not all the evidence nor the half of the words

uttered, *e. g.* we find this: "Examine the cases from *Patterson* v. *Tash*, down to *Laussatt* v. *Lippincott*, and the usage of trade." Now this was not said to the jury; but a memorandum to himself of the course he was to pursue in his address to the jury; and after being assigned as error, and much insisted on, was admitted to be what I have stated. Something similar occurs repeatedly in what is here called the charge. In a long and complicated cause, where much testimony is given, and many cases are cited, the judge in delivering his charge to the jury reads much, or perhaps all the testimony, and refers to many of the cases, perhaps reads some of them, and when requested to reduce his charge to writing, he never inserts in it the testimony read by him, never copies the cases commented on. The meaning of the law in its phrase, and in the uniform construction of it only requires his opinions on the matters of law applicable to the case.

The legal position, and in truth the only matter in contest here, was, that under the circumstances of this case *Hollinshead* had a right to deliver these goods to the defendants, commission merchants, to be sold, and account for the price, and had a right to receive a cargo from them on the credit of the outward cargo so left with them; and on the fullest consideration I think this opinion right on authority and on principle.

Before I come to that matter I shall consider a previous point or two. The law as to the power of a factor to pledge, arose on a question whether he could pledge the goods of his principal for his own previous debt, or for money then advanced *for his own use.* That was the case of *Patterson* v. *Tash*, and that was the matter decided in most of the cases, perhaps in all, before 1776; and it is not contested here. The fact whether this return cargo was for the use of the owners of the outward cargo, or of *Hollinshead*, is a fact for the jury, and was so left by the court; but he intimated an opinion on the facts. It has often been decided that he may do so. I am not sure he might not have gone further, and told them it was a conclusion of law from the facts proved, which might be rebutted by proof of collusion and fraud between the defendants and the supercargo. Let us look at the matter. Several men send goods in a vessel and appoint a supercargo; and we have evidence that the plaintiff and one other, directed him if he could not sell, to give the goods to a commission house and procure in advance a return cargo in coffee and sugar. We have no evidence of what the other shippers directed; but there is no dispute except with the plaintiff. The plaintiff and the other shippers had confidence in the supercargo, which continued for more than a year. He sold above six thousand dollars worth of their goods through the defendants; he paid freight and duties, &c. to above four thousand dollars through the defendants; during all this time the defendants do not know who was the shipper of the goods sold, or of those unsold. It is avowed, and was to the plaintiff expressly told by *Hollinshead.* (see their last letter) that he had sold

(Newbold *v.* Wright and Shelton.)

part of their goods to pay freight and duty *on the whole cargo;* in other words he mingles all the goods as long as he stays, and as he, or the defendants for him are selling; he puts all unsold into the defendants' store, and directs sale, and receives a return cargo the defendants shipped; not so much sugar to one, and so much to another; not so many bags of coffee to one, and so many to another; but generally by order of *C. Hollinshead* for whom it may concern. Were the defendants bound to know to whom this return cargo was alloted when it came to *Philadelphia?* Could they tell *Hollinshead* your principals have trusted you, but we will not? Were they bound to send a supercargo and to settle with all the shippers here? This is not pretended. How then could they know who was to receive the proceeds of what should be left after payment of their own advances? Were they not justified in leaving it to *Hollinshead* to settle here, and to write to them to whom the overplus in their hands was to go? This was what was meant by the sales being made on his account, and their conduct as to the residue being subject to his order; and is it not clear that every shipper knew this, and agreed to it? *Bispham,* and *Burrough,* and *Archer,* got each the order of *Hollinshead,* and on that each received portions of the goods. *Thomas & Martin,* who I have considered as the plaintiff, got his order; they were told it must be got. They assert no right without it; they get it, and send it, but after all the others, and only two hundred and ninety-three dollars left. I have seen no case, and do not believe it ever was, or will be decided, that a commission house abroad was bound to do more than ship the return cargo according to the orders of the supercargo. They are not, and cannot be bound to come here and see that it is divided rateably among those concerned; and without knowing that, it is impossible to know who will get any surplus which may be abroad. I think then the judge might have told the jury, that the return cargo must be taken to have been for the owners here: That unless the defendants colluded with *Hollinshead* to defraud the owners, all was right: That as all the persons here procured *Hollinshead's* orders for their respective goods, they all knew the whole goods were left subject to his order, and the plaintiff among the rest, and that it was too late to allege that the goods were left otherwise, at the end of eighteen months, so as to throw on the defendants a responsibility or loss, to which no contract, no understanding of the parties, and no usage of *merchants* would subject them.

It has not yet been said, that a factor cannot pledge his principal's goods to raise money for his principal, where he has the express direction of the principal to do so; and I shall assume it that it cannot be so said. Here, then, we have the express direction of *Thomas & Martin,* if their goods cannot be immediately sold, " to put them into the hands of a house of respectability, and obtain an advance of one-half or two-thirds in coffee." *Hollinshead* sold two hundred pieces to pay freight and duties *on the whole cargo,* and told them so. The defendants are not answerable for this; in fact no objection is

made to it; the rest are put into the hands of the defendants, who do advance coffee. Now, were the defendants bound to see that the plaintiffs get the coffee, or a share of it? They were not, and they were never told that the plaintiff did not for one year, and not then. In *May*, 1824, they were asked for an account; that account would be necessary for a settlement here. Soon after they are requested to procure *Hollinshead's* order. They delay this till late in the fall, and do not send it for two weeks after they have it. They had before stated that they wrote because *Hollinshead* was sick and requested the remittance to themselves, but they never said *Hollinshead's* letter was not necessary, or that the defendants were not bound by his instructions. The question then, must be left to a jury, if there can be any doubt about it, whether the defendants were not justified if they had seen the plaintiff's letter of instructions, and whether they did not comply with it; for I repeat, the defendants were not bound to come here and see that the plaintiff's own agent delivered them their share of the goods, and that not hearing from the plaintiff until next year, they had a right to presume all was right.

The course of business is constantly changing, and the names change. What were once called factors are now commission merchants. This alone would not change the rights of parties, but the duties have changed, and the powers have changed. A great part of the commerce of the world goes through their hands. It will not be attempted to define all their duties or authority, but whatever power they constantly exercise, and every body knows they exercise, is part of their contract with those who employ them, and may be lawfully confided in by those who deal with them. A custom of old, affected real property as often or more so than personal property, and could not exist without certain requisites. It is an entirely different matter from what is called the usage of trade, or usage of a particular trade, which may be good though the trade itself is not thirty years old. The usage of a trade is spoken of in every law book, and recognized as binding on those engaged in it, in every country, and where not contrary to some positive law, or to the general law and policy of a nation, and not *malum in se*, forms a part of and is considered in deciding on all cases in that trade. In short, it is equal to an express authority to do what all others in that trade do, and legalizes all acts done according to it. Whether such a usage exists, is to be decided by a jury; if found that it exists, the court are to say whether it is within any of the reasons which make it bad. *Laussatt* v. *Lippincott.*

If it is the usage that a commission house shall take goods in advance on an outward cargo, and pay itself out of the amount of sales, this must be presumed to be known to all who engage in the trade; and particularly is this the case, if, when informed of it, the principal does not object. The authorities on this subject go farther; a principal knows that his factor is and has been in the habit of buy-

ing and selling for the principal in the factor's own name, and writes to him advising of the price at which he may sell the goods on hand; the factor sells for less and fails; the principal detains the goods from the purchaser; the latter shall recover them, because the owners who have suffered the factor to continue dealing for them in the factor's name, shall not set up a latent special restriction to injure a fair purchaser. *Pickering* v. *Ass. of Hayward & another,* 15 *East,* 38.

This case has been put by the plaintiff on the authority of *English* decisions; and I admit the authority of *Patterson* v. *Tush*; but it, and all the cases which say a broker cannot pawn goods, express or imply that they are pawned for the broker's debt. To pledge for a debt of the principal is another matter. The factor himself may advance money to his principal on the goods, and has a lien on them for his own repayment; he may then pledge them to himself. A factor may employ a sub-factor; may not he also advance to the principal and retain till paid? I have found no case where the factor took up money for his principal on a deposit of the principal's goods, except to pay duties, and that is binding, not I apprehend because *it was to pay duties, but because it went to the principal's* use. But the goods here were not pawned; a pawn cannot be sold by the pawnee, unless, by modern decisions, after great delay. Now the defendants had authority to sell these goods the minute they received them; they were put into their hands to be sold; or, to speak more properly, were sold to the defendants, but the price to depend on what could be got for them by the defendants; at least it partook more of a sale to the defendants than a pawn. The course of the business here was unknown when *Patterson* v. *Tash* was decided; and the case is to be decided on principles applicable to the course of trade, that is to the intention and understanding of the parties. Let us now look to the authorities. 1 *Maule & Selwyn,* 140, has been cited to prove a broker cannot pawn, and it proves he cannot pawn the goods of his principal for his own debt. Lord ELLENBOROUGH, however, says " the defendants having authority to sell the goods, if they advanced money for any purposes connected with the sale, and for which brokers in the ordinary course of disposing of goods are accustomed to advance it, would have had a lien in respect of such advance." This case then recognizes the effect of usage and that under it goods may be left for sale by a broker, and an advance made, and a lien for such advance, or in other words the defendants could retain for their advances out of the proceeds of their sales. LE BLANC, Justice, says if advances were made to take up the bill of the consignor, and were appropriated to that purpose, there would be no mischief, and that might be considered in furtherance of the authority given by the principal; and BAILEY, J. says, cases may perhaps exist where a principal would be bound by a pledge by his factor. I apprehend however if money was advanced to a supercargo to take up a bill of his principal, it would not be necessary that

he should go along and see it paid to the holder of the bill; he might confide in the person in whom the principal had confided.

The case of *Laussatt* v. *Lippincott*, 6 *Serg. & Rawle*, 386, however decides every point in this case; it admits *Patterson* v. *Tash* to be law; it decides that an usage of trade may be proved; that the very usage proved in this case is not in violation of any principle of law; that a man may authorize another to pledge his goods; that this authority may be express or implied from the usage of trade. The plaintiff lived in this city and employed a broker here to sell his coffee, not under twenty-seven cents per lb.  The broker took it to the defendants, auctioneers, and in four separate parcels receiving each time the defendants' note, in all near five thousand dollars.  The broker only paid six or seven hundred to the plaintiff.  The defendants never asked the broker whose coffee it was, because he and other brokers dealt in that way.  It decides that leaving goods to be sold and receiving part of the price in advance, is not a pledge, but more like a sale; that the defendants if they knew the broker was not the owner might deal with him according to the usage, and the defendants had a power to sell irrevocable to repay themselves; and decides that it is wholly immaterial whether the advance made to the broker came to the hands of his principal or not.

This case was decided twelve years ago and was supposed to have settled the law. It was never complained of. The law of *England* is now by act of parliament made the same as this decision. So is the law of *New York* by a late statute. But what is more to the purpose, all the mercantile transactions of the community have been based on it. To overule it would unsettle all the transactions under it. The law as there settled meets the universal idea of justice, and conforms to the usage of the whole mercantile world at this time. If other authority were wanting, it is found in the opinion of Justice STORY, in *Evans* v. *Potter*, 2 *Gallison*, 13, according entirely with *Laussatt* v. *Lippincott*. The usage was acted on and fully proved by the plaintiff's witnesses *Jacob Thomas* and *James Martin*, who swore they had advanced money to the plaintiff on these goods, had a right to send them by *Hollinshead*, and were not answerable to the plaintiff. This proves that goods left with a commission merchant, on an advance of money by him, are nearer being sold to him than pledged. And it proves they knew of and acted according to the usage at *St. Jago* in directing *Hollinshead* to leave the goods for sale, and take an advance on them.  Now the usage proved, could justify them in this: nothing else.  Again, every owner knew of the terms on which *Hollinshead* left the goods, and not one complained.  It will be found that although *Bispham* and *Burroughs* and *Archer* each got back some of the goods left, yet that more or less of the goods of each of had been sold by the defendants and passed to the credit of the advance to *Hollinshead*, and not one of them complained. If *Hollinshead*, though a bare consignee, had a right to employ the defendants to sell these goods and to account to himself, and to him they must account,

(Newbold *v.* Wright and Shelton.)

he could have sued them and recovered and they could not have set off a debt from *Newbold* to them to prevent his recovery. 18 *John.* 24, *Toland* v. *Murray*. *Murray* applied to Chancery for an injunction, but Chancellor KENT decided as the court of law did. 3 *John. Chan.* 569. See also *Assignees of Dowding* v. *Goodwin, Cowp.* 251. The sub-factor had agreed to account to the factor, who was answerable to the principal, and who had a right himself to retain against his principal for his own advances or responsib.lities.

I have omitted the authority of Chancellor KENT, 2 *Com.* 489, of the first edition, and 626 of the second edition, because I will use it also for another purpose. He adopts the law as laid down in *Laussatt* v. *Lippincott* in the body of his work and the distinction there taken between a pawn strictly, and an advance from a commission merchant who receives to sell. In a note to page 491, he informs us, the law had been changed by statute in *England,* and since in *New York,* and says, 626, " a great deal may be said against the principle of the rule, and with the exception of *England,* it is contrary to the policy of all the commercial nations of *Europe.* On the continent of *Europe* possession constitutes title to moveable property, so far as to secure *bona fide* purchasers, *and persons making advances of money,* or credit on the pledge of property by the lawful possessor." Now this proves, to my satisfaction at least, the law of *St. Jago* independently of the testimony given in this cause, and accounts for the statement of the witnesses, that they knew of no judicial decisions on the point. Courts never decide where no one disputes. The law is so well settled that the *lex loci contractius* governs in the construction and validity of a contract, though it is to be enforced by the laws of the country where suit is brought, that I shall not cite authority to support it. I cannot see then, how we can avoid saying, the plaintiff is bound by this contract, which is valid where it is made, and valid here too, if made here, unless we overrule *Laussatt* v. *Lippincott.*

           Judgment reversed, and *venire de novo* awarded.