By the Court,

Cowen. J.
(The offer of the defendants, pre-supposed, what is now conceded, and is indeed extremely well settled, that prima facie the carrier is under an obligation to deliver the goods to the consignee personally. The authorities to this point are nearly all collected in Story on Bailments. 346, n. 3, and 2 Kent’s Comm. 604, 5. See also Golden v. Manning, 3 Wils. 425, 433; Owen, 57; and Storr v. Crowley, 1 McClel. & Young, 129, 138, per Hullock, B.
It would be too much, perhaps, to say that a uniform and well known usage, in either form put by the defendants in their offer, might not be received to govern the delivery. This is, I find, a very common head of evidence in fixing the obligation of bailees. Where the nature of the bailment raises an inquiry as to degrees of care, the customary modes of securing [307] the articles are open to inquiry (Story on Bailm. 9, 10). So as to the accompaniments with which a hired thing is to be delivered (id. 256), and the place in which an innkeeper is bound to keep the horse or carriage of his guest (id. 312; 2 Kent’s Comm. 592, 3d ed.) In Garside v. The Proprietors of the Trent and Mersey Navigation Company (4 T. R. 581), usage and course of business were received to determine whether the defendants, at the time when the goods were burned, held them as common carriers or mere wharfingers for the plaintiffs. The proof, too, was confined to the course of business in the particular line of stages, and determined the cause in favor of the defendants. In Hyde v. The same Company (5 T. R. 389), Grose, J'., who concurred with Ashurst and Buller, Js., that carriers by a canal must, by the general law, make a personal delivery to the consignee, agreed that the obligation might be affected by the customs of the trade. Nor do I understand the force of usage in such a case to be denied, but on the contrary, it is expressly admitted in Ostrander v. Brown (15 Johns. R. 39). In Sewall v. Allen (6 Wendell, 335), evidence of usage and practice was received to show that the defendants were common carriers of bank bills (see id. 350, 251, 360). In Barnes v. Foley (5 Burr. 2711), the question was whether it was the duty of the postmaster at Bath to deliver letters to the inhabitants at their houses. Proof of usage was resorted to, and Mr. Justice Aston said, “ the limits of the delivery are to be determined by the usage of the place,” p. 2714; and in Rushforth v. Hadfield and others (7 East, 224), all the court agreed in the propriety- of receiving such evidence to enlarge the rights of carriers. The defendants claimed a lien on the goods, not only for the price of carrying them in particular, but for a general balance due to them for previous carriage. The law denies to the carriers a claim for a general balance; but a long train of evidence was received, to show that custom and the course of trade among a particular sort of carriers had overcome the law. The jury found against the defendants; but the evidence was so imposing that they moved for a new trial, as for a finding against the weight of evidence; and the case details all the proofs. The judges proceeded to a full examination of *175 them, and a new trial was denied; but the case shows, and all the judges concur in declaring the principles on which such evidence is to be received. The cause was tried before Chambre, J., who put it to the jury, whether the usage were so general as to warrant them in presuming that the parties who delivered the goods to be carried knew it, and understood that they were contracting with the carriers in conformity to it; if not, the general rule of law would entitle the plaintiffs to a verdict. All the judges concurred that a custom of this kind, which is, quoad hoc, to supercede the general law of the land, should be clearly proved, and the interested encroachments of persons engaged in a particular trade, watched with great jealousy. None of them disapproved the qualifications under which the case went to the jury; and Lord Ellenborough, C. J., and Grose, J., put it on the ground of a usage so general, and so uniformly acquiesced in for length of time, that the jury would feel themselves contrained to say it entered into the minds of the parties, and made a part of the contract. But all this has nothing to do with the abstract question of competency. Usage, when it goes to change the law. always comes in subject to the principles declared in that case; (a) yet if counsel propose to prove such a usage, and think they can establish it, I am aware of no rule which forbids the attempt.
We are referred by the plaintiff’s counsel, to general propositions, well established by the cases. In Firth v. Barker (2 Johns. R. 335), we are told that usage never should be received to contradict a settled rule of commercial law. That was said on the authority of Edie v. East India Company (2 Burr. 1216), wherein Lord Mansfield had received evidence at nisi prius, of the custom of merchants, that in case of a bill of exchange [309] payable to order, the endorsement was restrictive, unless that also contained the word order. At the bar on motion for a new trial, he and the other judges agreed, that the law being settled, the custom of merchants could,not control it; that is to say, it would not subvert the law of the land as such; not that the parties might not make the endorsement restrictive by special agreement, or by the customary course of some particular business make an exception in their own case, leaving the general law to take its course. But in that case, the bill of exchange was drawn in the East Indies, and the main evidence came from bankers in London. Their opinion was taken to overturn a rule of law which pervaded the whole empire, and, indeed, the whole commercial world; and the jury were allowed to judge of that rule as they should take it from witnesses, and not from the judge. See also Newbold v. Wright, 4 Rawle, 195. And it was to a rule like this, a rule of general law, to which Dallas, C. J., was speaking, in Butt v. Conant (1 Brod. & Bing. 548), when he says: “ If the practice were against the first principles of constitutional law, and an encroachment upon the rights of the subject, I would not hold it to be law, if it had existed from the foundation of lióme.” If what had existed? The practice of a common magistrate to commit for libel. That, though general and ancient, if contrary to the constitution, would not be received to subvert the constitution in that respect. Yet, even in such a case he considered practice as high evidence of the law, and ordered precedents to be searched; and finally, not being mot by the constitution, he sanctioned the exercise of the power. Plowd. 170, is also cited, that custom can not make land appurtenant to land, because it is legally impossible that one thing should be appurtenant to another of the same kind; *176 and 2 D’Anv. Abr. 424, 427, to the general proposition against unreasonable customs. Both books, however, agree that reasonable customs, that is to say, those which may stand with law and policy, maybe allowed, and form exceptions to the general rule. It would be too much to say, that one [310] delivering goods to a carrier by stage, may not expressly, or which is the same thing, if he knows the usage of the stages to be so, impliedly consent to a delivery at the stopping place, instead of his consignee’s place of business. In Hyde v. The Trent and Mersey Navigation Company, Lord Kenyon, C. J., went into a very elaborate argument, to prove that stagemen and other carriers had this right by the general law. It'would, after that, be arrogant to condemn the conventional right as illegal, or contrary to sound policy. I say conventional, because, I agree that these cases must be limited by the rule of Rushford v. Hadfield; Rapp v. Palmer (3 Watts, 178), is against the plaintiff, though supposed by his counsel to be the other way. A carrier on the Ohio, without any express authority, sold a cargo of corn; and in trover by the owner, against the vendee, he set up the custom of carriers along the Ohio and Mississippi, to sell in that way. The court do not deny, that such a custom being ancient, certain, uniform and reasonable, might make an exception. But they rely on the weakness of the proof. It went mostly, to fraudulent cases of sale, and freighters would have no security against endless abuse, if it were once known that carriers, along our rivers and canals, could make a good title without express authority to sell. There is more reason in the case at bar, than in ordinary lines of carriage not bound to a conveyance and a delivery of the mail.
I know the law deals with common carriers in very strict measure, which ought not to be relaxed, on slight evidence. In Richmond v. Smith (8 Barn. & Cress. 9), a guest ordered some of his luggage to be placed in the commercial room, whereas it was customary with the innkeeper to order it into his guests’ bed-rooms. The guest ordered it out of the commercial room, and exposed a part of it for sale, and returned the residue to the same room whence it was stolen. The court said the innkeeper was like a common carrier, and could not get rid of his common law liability without giving express notice. Lord Tenterden, O. J. said, that if the defendant did not mean to be liable for goods thus placed, he should have said so. As [311] Story, J. remarks, the case did not call for the dictum resembling the case to one of a common carrier (Story on Bail, 309). But suppose the guest had come to a full knowledge of the landlord’s practice, either by its general notoriety, or in any other way, it appears to me, this would have been equivalent to express notice. It would have been so within several of the cases cited. It is more reasonable in the case of an obligation, to deliver personally by common carriers. That must, in the nature of things, be many times dispensed with. Carriers, by ships and boats, must stop at the wharf; rail road cars must remain on the track. In these cases, notice should be given to the consignee, of the arrival and place of deposit, which comes in lieu of personal delivery (see 2 Kent's Comm. 605, 3d ed.) and the cases there cited.
In Golden v. Manning (2 Bl. R. 916; 3 Wilson, 425, 433, S. C. and see Storr v. Crowley, 1 M’Clel. & Young, 129), Could, J. said, lie thought that all carriers are bound to giye notice of the arrival of goods, to the persons to whom they are consigned, whether bound to deliver or not. Prima facie this must be so, unless the notice is also dispensed with by the custom. Gould, J. was speaking of this very case, of a land carrier; and I do not well see how the carrier can escape the imputation of gross negligence, if he do not, at least, give notice, in order that the consignee may send for the goods. How is he, otherwise, to find out the fact of the delivery. Lord *177 Kenyon, C. J. in the opinion before cited, though he was to learn it by a letter of advice which should be sent by the consignor. But that can not always state the place, much less the exact time of the delivery at the inn. His lordship suggested, that the business of delivery might be left to the innkeeper, who should send his porter. All these things may, I agree, be possibly explained by the custom proposed to be given in evidence I do not understand that the defendants here gave any notice to the consignees, although they might have been easily traced by the superscription. They rested every thing on the custom. The proposition, therefore, struck me at first as too short. I thought it should have come up to a custom of delivering at the inn, without notice to the consignee. The offer may, [312] for aught I knoV be equivalent to that. I should think it essential, either to establish one of the customs as proposed, and follow it with proof of actual notice, to show that the custom dispensed with notice. Such a custom of such age, uniformity and notoriety, that a jury would feel clear in saying it was known to the plaintiff, I think would be admissible. He would be bound by it, the same as if he had directed a delivery at the inn. And on the offer made and overruled, I therefore think there should be a new trial, the costs to abide the event.

 In cmtractibus tacite veniunt ea, qua sunt morís et consuetudinis. Story on Bailm. 256. The rule with the qualifications under which it is to be received in evidence is also well illustrated by several American cases ; among which see Newbold v. Wright, 4 Rawle. 95, 211, per Rogers, J., which was an attempt to maintain a locf.l custom for a factor to pledge the goods of his principal at St. lago de Cuba. See also Callings v. Hope, 3 Wish. C. C. R. 149.