HOWE (DIKE v.). See Case No. 3,906.

HOWE (GARDINER v.). See Case No. 5,-219.

HOWE (HUNT v.). See Case No. 6,891.

---

## Case No. 6,767a.

### HOWE et al. v. The LEXINGTON.

[3 Betts, D. C. MS. 31; 2 N. Y. Leg. Obs. 4.]

District Court, S. D. New York. Jan. 2, 1843.

CARRIERS—BILL OF LADING—DELIVERY OF GOODS —CUSTOM AND USAGE—MEASURE OF DAMAGES.

[1. Where a bill of lading appoints no particular method of delivery, the carrier must at least give notice of the time and place of unlading, or the place of deposit; and a usage or custom, to excuse such notice, must be so clear and notorious as to afford a presumption that all parties acted with an understanding of its character and application.]

[Cited in Snow v. The Inca, Case No. 13,-145a.]

[2. Where, under a bill of lading, goods are to be shipped by water, and the carrier, without notice to the shipper, transships them by rail, a custom of the vessel to land and store goods without notice to the consignee is not applicable.]

[3. Goods were loaded on board a vessel under a bill of lading which appointed no particular method of delivery. The carrier, not receiving a full cargo, without notice to the owner, transshipped them by rail, and upon their arrival, not being able on inquiry to find the consignee, placed them in the warehouse usually employed by the carrier, where they were subsequently found by the consignee, and tendered to and unconditionally refused by him, though they were in a perfectly safe and sound condition. Held, that the mere transshipment and deposit in the warehouse subject to charges did not amount to a conversion entitling the owner to recover the full value of the goods, but that the carrier should have given the consignee notice of arrival through the public papers and the post office, and that the consignee might recover the difference in the market price between the day of arrival and the day when he had knowledge thereof.]

[Cited in Knox v. The Ninetta, Case No. 7,-912; The Joshua Barker, Id. 7,547; Lowry v. The E. Benjamin, Case No. 8,582.]

[This was a libel in rem by William L. Howe and Benjamin C. Cummings against the schooner Lexington, for failure to deliver goods under the terms and conditions of a bill of lading.]

C. Belcher, for libellants.

N. F. Waring, for claimants.

---

BETTS. District Judge. The libel arises upon a bill of lading executed at Philadelphia by the master of the schooner Lexington, February 23, 1842, by which he acknowledged the receipt on board his vessel of thirteen tierces seed, to be delivered at the port of New York to the libellants or their assigns, they paying freight. The libel avers that the goods were not transported to New York and delivered pursuant to the contract; that the master did not proceed with the schooner with all reasonable dispatch, and bring the said seed to the port of New York within a reasonable time; and that he has wrongfully converted the seed to his own use. The respondents allege performance of the contract.

The case upon the facts is briefly this. The schooner, at the time these goods were received on board, was up at Philadelphia for freight to New York; but not obtaining a cargo, and it being mid-winter, the master concluded to transship the portion of cargo taken on board, and forward it by the Transportation Line across New Jersey. This was done about the 26th of February. Some of the shippers at Philadelphia assented to the change of conveyance, but no consent was given in this case, and none was applied for. The seed had been shipped originally by Mr. Quinn in behalf of Smith, Bagerley & Co., and a receipt taken from the master therefor, and afterwards, being purchased by the libellants, he surrendered that receipt, and obtained the present bill of lading from the master. When the seed was shipped, it was understood the vessel would wait for a full cargo, and, as freight at the time was dull, it was uncertain when she would fill up, and he (Quinn) directed or advised the transshipment at the time it was made. The seed arrived in New York between the 1st and 3d of March, and the consignees, B. C. Cummings & Co., not being known to the agents of the Transportation Company, and on inquiry they not being able to find such firm or person, or ascertain their place of business, after three or four days' delay, were stored in a warehouse usually employed for such purposes by the company. The seed went into the warehouse on the 5th of March, and the proof is that Mr. Cummings subsequently ascertained at the office of the Transportation Company that it was there, and also called at the warehouse and saw it, and that delivery was offered him on payment of charges, to wit, freight and storage, the latter at six cents on each cask per week. Mr.

Cummings stated that the seed had not been delivered according to agreement, and he should leave it until he made further inquiries. Subsequently he gave notice to the master of his refusal to accept the seed, and demanded its equivalent in damages, and therefore this suit was instituted.

The main proposition upon which the action was rested by the libellants is that the contract of affreightment was a special one, and that the vessel is bound to its performance according to its terms, and that the master, by transshipping the seed, without showing a case of necessity, has violated the shipping contract, and rendered the vessel liable for the value of the property. Other particulars were brought in incidentally to show a probable injury to the shipper by diverting the lading from one mode of transportation agreed upon, to a different one, but the proofs on that branch of the case are not very definite or satisfactory, and at best, perhaps, can be claimed to amount to no more than to leave the fact in doubt whether the libellants would have been better or as well off, in respect to the state of the market, if the seed had continued on board the schooner, and been brought here in the ordinary course of voyage by sea. In view of the case the question would become entirely technical, and the decision of the court would be limited to the point whether, upon an unnecessary transshipment of goods, the bill of lading is absolutely broken, and the affreighter is entitled to demand their value, irrespective of the fact whether they were brought to the port of destination and delivered by the substituted conveyance as speedily, and as advantageously to him, as if they had remained in the vessel where first placed. I do not, however, consider it worth while to moot a point so narrow and injurious, and shall weigh the facts and circumstances in proof to ascertain whether the tierces of seed have been delivered according to the bill of lading, and, if that is found so, shall regard the contract as substantially performed, without heeding the method of performance as of moment in the case.

Had the schooner brought the tierces to this port, what was the obligation of the master, under his bill of lading, in respect to them? Carriers by land or water are bound to make delivery of the goods conveyed conformably with the condition upon which the bailment was received. Story, Bailm. § 538–541; 4 Pick. 371; 15 Johns. 39; 6 Cow. 268; 2 Wend. 327; 6 Wend. 335. An undertaking on shipment to deliver the goods to an individual or his assignees is not satisfied by landing them on a wharf or at a warehouse, unless notice be given the owner. 15 Johns. 39; 2 Kent, Comm. 603, 605, and notes; Story, Bailm. § 543. Notice must be given the consignee, if the goods are delivered at a place of deposit or business (4 Durn. & E. [Term R.] 581; 5 Durn. & E.

[Term R.] 389), because the prima facie obligation of the carrier is to make the delivery personal (4 Price, 31; 3 Brod. & B. 177), unless, by the contract, express or implied, some other mode of delivery is substituted (2 Barn. & Ald. 356), and the decisions do not ratify a discrimination (intimated Judge Buller) in this respect between carriers by land or water (Holt, Shipp. 359). The bill of lading in this case having appointed no particular method of delivery, the carrier would have been bound to make it personal, or what should be equivalent to that,—such, at least, as notice of the time and place of unlading, or the place of deposit. 15 Johns. 39; 4 Pick. 371; Story, Bailm. § 543–545. And clearly it would not be sufficient satisfaction of such obligation to store the goods, and await their being discovered and demanded by the consignee. If any usage or custom of the port is relied upon to excuse a compliance with the terms of the bill of lading, it should be one so clear and notorious as to afford a presumption that all parties acted with an understanding of its character and application. The Aberfoyle [Case No. 17]; The George [Id. 5,329]; The Reeside [Id. 11,657]; Brown v. Jones [Id. 2,017]; Rogers v. Mechanics Ins. Co. [Id. 12,016]; 17 Wend. 305. Without any evidence in the case to that effect, I shall hold that such diligence was not used, on the arrival of the goods in New York, to apprise the consignee of their place of deposit, as to render storing them in a warehouse a delivery to him, on the part of the owners of the schooner, supposing they had been brought in her.

There is testimony showing that the delivery was in consonance with the accustomed course of business with the Transportation Line, and might probably be sufficient in respect to shipments made directly with that association. 17 Wend. 305. That point, however, it is not now necessary to decide or consider, because the transshipment from the schooner being the act of the master, without the assent of the libellants, the company become his agents in the transaction, and he must show a fulfillment of his engagements, at least to the same extent he would have been bound to perform them, had the goods been brought here in his vessel, and he then might not even be protected against loss or injuries by a defense which would have availed his own vessel. Trott v. Wood [Case No. 14,190]. It is proper also to observe, in this connection, to avoid any inferences not intended to be authorized by the decision, that if either the usage of business, or the contract of affreightment, had authorized the schooner to place the goods in a warehouse, or land them on the wharf, it would not follow that, in a voluntary transshipment of this kind, the same method might be pursued by the substituted vessel, for the owner, knowing the ship to which he had confided his goods,

might take means to protect his interest by keeping himself advised of her proceeding or arrival; or he might trust to the goods remaining on board the usual period of time after the vessel should have come in. If then put to the risk of demanding and taking the goods when brought into port, the owner might stand upon a better footing, in having them remain with the vessel in which he had placed them, than to have them transferred to another, bringing them with entire safety, and equal or greater dispatch.

The contract entered into by the master not having been performed by him, the next inquiry is as to the consequences. It is manifest, upon all the authorities, that, if the goods are lost or deteriorated, the ship or her owners are bound to bear the loss (Holt Shipp. pt. 3, cc. 2, 8; Abb. Shipp. pp. 249, 250), unless protected by exceptions in the bill of lading; and, when the transshipment is without necessity, the vessel or her owner cannot have advantage of that protection (Shieffelin v. Wheaton [Case No. 12,783]). In both cases the owner of the goods recovers to the amount of his actual damages, for the substance of the contract has not been performed, the goods not being put in his possession in the condition it was stipulated they should be delivered. He may accordingly refuse to receive them, and claim their full value, or take them with compensation for their deterioration. The ground for the allowance of damages, and their measure, in such case, is apparent; but in this case the goods are offered the libellants in a perfectly safe and sound condition, and the breach, therefore, does not touch the vital and substantive part of the contract. An action at law on the bill of lading would, on such a state of facts, entitle the plaintiff to recover the special damages sustained in consequence of the imperfect execution of the agreement on the part of the master. This would be the ordinary remedy. [Vassa v. Smith] 6 Cranch [10 U. S.] 226; 8 Johns R. 13. The carrier, being under the law, charged with the responsibility of an insurer, should be subject to the same rule of damages when the action rests upon the contract; and the insurer is liable to the amount of actual loss. 1 Phil. Ins. 285; 2 Phil. Ins. 495. Suits in admiralty, however, are not subject to the limitations as to modes of procedure or remedies that attach to actions at law. The whole case is presented upon its facts and equities. The redress rendered is commensurate to the grievances and demand, admiralty courts being in no way trammeled in the exercise of their jurisdiction by technical names or forms of suit. This libel not only alleges a breach of contract, and seeks the redress an action ex contractu would afford at law, but it furthermore charges a conversion of the goods, and proceeds as in trover for such tort; and accordingly the question is directly presented whether the transship-

ment of the goods at Philadelphia, and deposit of them in a warehouse in New York, to be detained until the charges incident to this substituted conveyance should be satisfied, is a wrongful conversion of the goods, entitling the owner to recover their entire value against the first depositary. There is no refusal to deliver on demand proved, so as to raise the question whether the master of the schooner could lawfully claim storage fees, or whether the freight charged exceeded that stipulated by the bill of lading. The libellant Cummings did not demand the goods; and, when they were proffered to him on payment of charges, he made no objection to the charges, but said the delivery had not been made according to agreement, and he should leave the seed until he made further inquiries. Admitting that the detention of the goods might constitute a conversion on the part of Mr. Monroe (the warehouseman) or the Transportation Line, if demanded by the owner, yet their possession, being lawful in its inception, in respect to their own acts, would not become wrongful, unless set up in opposition to the right of possession of the true owner. Story, Bailm. §§ 105, 107. There would accordingly be strong reason to question the right of the libellants to sustain an action against the second bailees, without a previous demand of the goods; but, however that might be at law, or what the personal liability of the master in tort or assumpsit, it is now to be inquired whether a right arose to the libellants to proceed against the vessel, on this state of facts, and demand the full value of the goods shipped on board.

The doctrine that the shipment of goods on freight creates an obligation maritime in its character, and which may be enforced in rem against the vessel by admiralty courts, I shall consider so far as settled by adjudication in our own courts as to furnish the rule of decision in this case. The Rebecca, [Case No. 11,619]; 2 Gall. 378; The Betsy [Case No. 1,364]; The Volunteer [Id. 16,991]; Certain Logs of Mahogany [Id. 2,559]. I am given to understand that the point is under review before the circuit judge of this district, on appeal in a neighboring district; and his decision, if it lays down a different rule, will thereafter become the law of this court. There would be no distinction as to the competency of admiralty jurisdiction, under the doctrine of these authorities, whether the claim of reparation arose from malfeasance or nonfeasance; and, as has been already suggested, the allegations and recovery in admiralty courts are in conformity to the right of the case in all its circumstances without the necessity of employing different forms of action to reach the remedy. If, then, a case is established here which would charge the owner of the vessel, relief to the same extent, the contract being maritime, will be given against the vessel.

According to the opinion already indicated, the substantial part of the contract was per-

formed. The goods were safely transported and delivered here pursuant to the bill of lading, and the owner had knowledge that they were at this port, and subject to his order. One incident of the contract, however, had not been fulfilled. The cargo was not placed in possession of the libellants, nor had they immediate notice of its arrival in the port of New York. A distinction exists, in the nature of things, between the mode and degree of actual delivery of goods transported inland in small parcels by carriers, and that of large packages or a cargo, water borne, and brought from abroad. The difference is adverted to in the cases, and the result of the discussions in the courts on the point seems to be that although the contract of carriage only stipulates to transport the goods from one port to another, yet it is not satisfied, as Mr. Justice Buller at first held, by unlading them at the port of delivery. 5 Durn. & E. [Term R.] 389. But in addition to that, due and reasonable notice must be given the consignee unless such notice is excused or rendered unnecessary by the terms of the bill of lading. 2 Kent, Comm. 604, 605; 4 Pick. 371; Story, Bailm. (2d Ed.) § 544; 4 Bing. New Cas. 314, 330. In Golden v. Manning, 3 Wils. 429, the court discussed the question as to the duty of carriers after the goods reach the place of destination. The general rule declared was that if the undertaking did not impose on the carrier the necessity of a personal delivery, and the goods, being of great bulk, or for other cause, are deposited in a warehouse, the carriers are obliged to send notice to persons to whom goods are directed, within a reasonable time. The law has not settled definitively whether such notice shall be actual, or only implied, nor the method of giving it; and therefore, according to general principles, it must at least be such as, under the circumstances of the case, would be reasonable. The libellants having no known residence or place of business in the city, and having taken an undertaking upon the bill of lading to have the goods delivered here, it would be consonant to the usual course and habitude of transacting business in analogous cases to give notice in the public papers, and also through the post office. This latter has become a medium of notice in mercantile transactions so common and so well recognized by law as to render an omission of that mode of giving information a laches, unless accounted for upon satisfactory facts or circumstances. There is nothing in the evidence to excuse it in this case, and as the bearing of the proof is that the price of clover seed declined from one to two or two and a half cents per pound, between the arrival of the cargo here and the knowledge of its arrival acquired by the libellants, they are justly entitled to be reimbursed that loss. They cannot hold the whole contract broken upon this particular, and recover the whole value of the shipment, but ought to have received the goods when tendered them, exacting only an indemnity for the omission to fulfill the duty of giving notice dependent upon the arrival of the property in port. I shall decree accordingly, and, if the parties do not settle this loss at 1½ cent per lb., a reference must be had to compute the actual loss, when further evidence to that point may be adduced by either party. Order accordingly.

[The case was referred to an auditor to take further proofs in the question of value. The libellants filed exceptions to the clerk's report. which were overruled. Case No. 6,767b.]