## Case No. 11,058.

### The PEYTONA.

[2 Curt. 21.] [1]

Circuit Court, D. Maine.    Sept. Term. 1854. [2]

SHIPPING—CARRIAGE OF GOODS ON DECK—DELIVERY ON WHARF—NOTICE TO CONSIGNEE—EXCUSES FOR FAILURE TO GIVE SUCH NOTICE.

1. The burden is on the ship-owner to prove that the shipper agreed that his property might be carried on deck.

[Cited in Chubb v. Seven Thousand Eight Hundred Bushels of Oats. Case No. 2,709. Cited in brief in The Delaware, 14 Wall. (81 U. S.) 594.]

---

[1] [Reported by Hon. B. R. Curtis, Circuit Justice.]

[2] [Affirming Case No. 11,059.]

2. In a suit in rem against the vessel, to recover the value of the goods lost or damaged, the master is an interested witness; but a release from some of the part owners renders him competent.

3. Though delivery may be made by landing property on a wharf and giving notice to the consignee, where such is the custom of the port, yet such notice, or a valid excuse for not giving it, is indispensable.

4. If the master has wrongfully omitted to sign bills of lading, and sailed without learning the names of the consignees, he cannot avail himself of this ignorance as an excuse for not giving notice of the landing of the goods.

[Cited in The Thames, 14 Wall. (81 U. S.) 107.]

[Cited in Robinson v. Chittenden, 69 N. Y. 535.]

5. Though, ordinarily, the master is not bound to seek out the consignor for the purpose of signing bills of lading, yet if, when they are presented to him by an agent of the consignor, he objects to one of their stipulations, and says he will call on the consignor, and sails without doing so, he is in fault, and cannot have any advantage from the non-existence of bills of lading.

[Cited in Fox v. Holt, Case No. 5,012.]

[Cited in Hatch v. Tucker, 12 R. I. 505.]

In admiralty.

Fessenden & Deblois, for appellants.
Mr. Evans, contra.

CURTIS, Circuit Justice. This is a libel filed by John Plaisted, of Gardiner, in the district of Maine, against the schooner Peytona [Daniel Lane, Jr., claimant], in which it is alleged, that on or about the fourth day of February, 1854, Lee, Claflin & Company, by order of the libellant, shipped on board the Peytona, then lying at Boston, four hundred and seventy-three slaughter hides, the property of the libellant, to be carried to Belfast, in the district of Maine, and there delivered in like condition as when shipped to the libellant, or his agent, the dangers of the seas only excepted. That the schooner arrived at Belfast on or about the ninth day of the same February, but the hides were not then and there delivered to the libellant or his agent. That the master of the schooner, contrary to his duty in that behalf, stowed the hides on deck, whereby over one hundred and eighty-four were lost, and the residue were landed at Belfast, and left in the open air, for the space of four weeks, without any notice to the libellant, or his agent, and thereby were materially injured. The answer admits the shipment of the hides, but alleges that the shippers knew they were to be carried on deck and assented thereto; that it became necessary in the course of the voyage to make a jettison of some of the hides, and that others were washed overboard. That on the arrival of the schooner at Belfast, the remainder of the hides were landed as soon as practicable, the schooner having been delayed in the river six or seven days by the ice. That the master was not informed by the shipper, who was the owner of the hides, nor to whom they were to be

delivered at Belfast. That they were not in a condition to be stored; that all that could be done was to pile them up on a wharf; and that this was done. Upon these allegations, proofs having been taken, the district court made a decree in favor of the libellant [Case No. 11,059], and the claimant appealed.

The case presents two distinct questions,—the first being whether the vessel is answerable for the hides washed or thrown. overboard on the passage; the second, whether the vessel is liable for the damage suffered by the hides which were landed. The first of these questions depends upon the authority of the master to stow the hides on deck. If he was authorized so to do, it is not seriously questioned by the libellant that the destruction was, under the circumstances, his loss. If he wrongfully placed them on deck, it is not denied by the claimant, that they were at the risk of the vessel. And it was also properly conceded by the counsel for the claimant, that the burden is upon him, to prove the consent of the shippers to have them carried on deck. Upon a shipment being made, it is an implication of law, in the absence of a special contract, that the master is to sign bills of lading in the usual form; and the effect of such a bill of lading is, to oblige the master to carry the goods under deck. This part of the case, therefore, is merely a question of fact, whether the claimant has proved a special contract to carry the goods on deck? He relies on the testimony of Asa S. Small, the master of the schooner, of Horace G. Small, the mate, of Samuel West, who was temporarily employed on board while the vessel lay at Boston, and of Benjamin Small, the master of another vessel, who speaks to the state of the cargo of the Peytona on the day when the hides came on board.

The testimony of the master was objected to, as not competent. I consider him interested in the event of this suit. If a recovery is had against the vessel, the master will be liable to the owners for the amount of damages and costs which they will have been obliged to pay. In such a case it is well settled, at the common law, that the master is not a competent witness to disprove his own negligence or improper conduct. Green v. New River Co., 4 Term R. 589; De Symonds v. De La Cour, 2 Bos. & P. (N. R.) 374; Hawkins v. Finlayson, 3 Car. & P. 305; Whitamore v. Waterhouse, 4 Car. & P. 383. No reason is perceived why the same rule should not be applied in the admiralty, in cases not coming within the exception on account of necessity. The Boston [Case No. 1,673]. And it has been so applied by Mr. Justice Story, in The Hope [Id. 6,678], and by Judge Ware in The William Harris [Id. 17,695]. In the case of Citizens' Bank v. Nantucket S. S. Co. [Id. 2,730], which was very strongly contested, and in which I was of counsel while at the bar, no doubt was

entertained that the master was incompetent without a release. It was so held by Sir William Scott in The Exeter, 2 C. Rob. Adm. 261.

But this witness has been released by all but one of the part owners of the Peytona, and I am of opinion this release has rendered him competent. A claim over, on him by the part owners, would be a joint claim, and, consequently, a release by one bars all. Whitamore v. Waterhouse, 4 Car. & P. 383; Hockless v. Mitchell, 4 Esp. 86; Bulkley v. Dayton, 14 Johns. 387. I have, therefore, taken the deposition of the master into consideration. But I am not satisfied upon the whole evidence, that the shippers assented to the carriage of this property on deck. I do not deem it necessary to detail the evidence, or the considerations, which, upon a careful examination of it, have left serious doubts on my mind concerning the correctness of the master's last deposition. He is a released witness, testifying to the controlling fact in the cause, so as to exonerate himself from blame. There are important discrepancies between his two depositions. Though he is corroborated by the mate, and by Wells, in part, yet the latter admits he paid no particular attention to the conversation, and the memory of the former is so much at fault upon facts of some importance, that full confidence cannot be given to his evidence. The rate of freight is admitted to have been the customary rate, and this renders it improbable that the shippers agreed to have the property go on deck. The witness, Cunningham, who applied to the master to have the hides carried, denies that he agreed to have the hides go on deck, or undertook to inquire of the shippers if they would consent thereto. The fact that the bills of lading were made out as for under deck freight, tends to support his statement. Pingree, who brought down the bills of lading, and Gill, who accompanied him, contradict the master on very material points. If their evidence is credible, it is hardly possible there could have been a contract to carry on deck, and there is nothing in the cause which tends to shake their credit. There is testimony from the claimant's four witnesses, tending to show that when the hides were shipped, the hold was full, and they could only be carried on deck. There is evidence from two of the libellant's witnesses to the contrary. Without undertaking to decide how the fact was, I think it safe to conclude, that if the hold were then full, Cunningham did not know it. If he is to be credited, he certainly did not. If the claimant's witnesses are believed, the hatches were on and he could not know what was in the hold. But at all events, the fact is not decisive, because the master might choose to take this property on deck at the risk of the vessel, as indeed he admits he did, some of his deck freight; for in enumerating his deck load, he mentions, "some satin white, which ought to have gone into the hold, but we could not

get the casks in there, the hold was so full." Upon a careful consideration of the evidence, such serious doubts remain in my mind, that I cannot pronounce the contract to carry on deck proved, and must therefore hold the vessel liable for the loss of the hides thrown or washed overboard.

The other part of the case is attended with less difficulty. The duty of a master is, to deliver property to its consignee. Where such a mode of delivery is usual, it may be made by depositing the goods on a customary wharf, and giving notice thereof to the consignee. But this notice, or some equivalent for it, or excuse for not giving it, is indispensable. Ostrander v. Brown, 15 Johns. 39; Chickering v. Fowler, 4 Pick. 371; Gibson v. Culver, 17 Wend. 305; Merwin v. Butler, 17 Conn. 138; Gatliffe v. Bourne, 4 Bing. N. C. 314, and same case in error, 3 Scott, N. R. 1. The excuse set up by the answer in this case is, that the master was not informed by the shipper, who was the owner of the hides, or to whom they were to be delivered at Belfast. This is not supported by the proofs. It is true, no bills of lading were signed, and so, there was no consignee named in the customary way. But, in the first place, I consider the master in fault, that bills of lading were not signed. Pingree says, when he presented the bills of lading a second time to the master, he promised to come to the counting-room of the consignors that afternoon at four o'clock, and see the senior consignor about the bills. The master does not deny this. He did not go. He moved his vessel to another wharf so that when Pingree went to his former berth, the next day, he did not find the vessel, and supposed she had sailed. In point of fact, the vessel waited four or five days for a wind, and then sailed. Now though it is, I think, usual, to present bills of lading to the masters of vessels for signature, and ordinarily, it is not incumbent on them to seek out consignors and sign them at their places of business, yet a bill of lading is the customary and proper shipping document, and should be signed by the master before sailing. The particular place where they are to be signed is regulated by usage, founded on convenience, in the absence of a special undertaking. When a master agrees to go to the counting-room of the consignor and settle the terms of the bills of lading, and sails without doing so, it would be allowing him to take advantage of his own wrong, if he were permitted to avail himself of the want of a bill of lading, to excuse himself from the performance of the duty of giving notice to the consignee of the arrival of the goods. Besides, the master did know that it was the intention of the shippers to consign these goods to Lewis & Millan. They were named as consignees in the bills of lading presented to him for signature. He did not object, and he had no right to object

to their being the consignees. The point left unsettled was, whether he should agree to deliver to Lewis & Millan at their wharf. I am by no means clear that under the circumstances he was not bound to do so. As the bills of lading were drawn, they imposed that obligation on him. He refused to sign them, but agreed to see one of the consignors. He sailed with the goods without doing so. Certainly the consignors had not assented to any other delivery than that provided for by the bill of lading. Non constat that they would have assented to any other. And I think it would be difficult to maintain, that sailing with the goods under such circumstances was not an assent on his part to the terms of the bills of lading. But it is not necessary to decide on this ground. The master was apprised by the bills of lading that Lewis & Millan were designated by the shippers as the consignees of the goods, and to them he was bound to give notice of their arrival. Having failed to do so, the vessel is liable for the deterioration of their value, from exposure to the weather on the wharf.

In respect to the amount of damage I affirm the judgment of the district court. The libellant having taken additional evidence on the question of damages, has sought to increase the sum awarded below. But he did not appeal from the decree. It is only where the circuit court reverses the decree of the district court, that it is to proceed to render such a decree as the district court ought to have rendered. 1 Stat. 85, § 24. This court cannot pronounce a decree for increased damages, without first reversing the decree of the district court on the subject of damages. This it cannot do on the prayer of the appellee. Stratton v. Jarvis, 8 Pet. [33 U. S.] 4; Canter v. American Ins. Co., 3 Pet [28 U. S.] 307. A cross-appeal should have been taken, if he was dissatisfied with the amount of damages awarded by the district court. Having omitted to do so, he has waived all right to further damages, and can claim nothing more than an affirmance of the decree of that court. The decree of the district court is affirmed with costs.