By the Court.&emdSmith, J.*
The issues of fact in this cause having been tried by the court without a jury, and the appeal being taken from the judgment entered on the decision of the court, it becomes our duty to determine whether any error of law or of fact *68 has been committed to the prejudice of the appellant. The defendant insists that it proved on the trial a custom which made the delivery of the wheat in question at the Niagara elevator a fulfillment of its contract of affreightment, and that the freight was therefore earned. The custom claimed to have been proven is, that where a cargo of grain carried by a vessel from a port in another State, to the port of Buffalo, consists of two or more parcels consigned to different persons, under bills of lading containing no other provisions as to delivery than that the grain shall be delivered to the consignee or his assigns, the person who is the consignee of the major part of the cargo may appoint and direct at what elevator his part shall be delivered; and that the discharge of the whole cargo into the elevator so designated is a good delivery as to each of the several parcels, though the consignee of the minor parcel may have given express and timely directions that his parcel be delivered at another elevator. A custom such as the defendant sought to prove, has the force of law. To establish it, the usage must be shown to have been uniform, long settled and well-known, so that the parties shall be presumed to contract with reference to it. And it has been wisely said that “ a custom which, quoad hoc, is to supersede the law of the land, should be clearly proved, and the interested encroachments of persons engaged in a particular trade watched with great jealousy” (Per Cowen, J., in Gibson v. Culver, 17 Wend. 305, 308).
Without reviewing the evidence in detail, I concent myself with saying that after a careful examination of all the testimony, I fully concur in the conclusion of the court which tried this cause, that the defendant failed to establish the existence of the alleged custom. Upon this head, I will only refer to the very significant testimony of Mr. Richmond, one of the plaintiffs, as to *69 the interview between him and Mr. Bullard, the defendant’s general manager, touching the delivery of the grain in question in this case. Mr. Richmond says he ‘ ‘ called on Mr. Bullard, and asked him what he meant by saying he would not take the grain to the Richmond elevator. He spoke about the prices paid for carrying grain, and that he had been found fault with by other carriers for carrying grain around town in this way, and that he had decided that morning not to do so any longer, and that he would take the grain where the majority of the cargo was consigned.” The accuracy of this testimony was not called in question. Mr. Bullard, though called as a witness in the cause and after Mr. Richmond had testified, did not in any manner contradict his statement.
But the defendant claims that, irrespective of any usage or custom, the delivery of the wheat at the Niagara elevator was a good delivery, under the rules of the law merchant that govern the case. The claim is, in effect,' that a vessel arriving at this port, laden with grain, may discharge its cargo into such elevator as may best suit the convenience of the vessel owner, who may wholly disregard the direction of the consignee in respect to its delivery. I say this is the defendant’s claim in effect, because the rule which the defendant asserts must of course apply in all cases, as well to a whole cargo as to one-third of the whole, for it is asserted as a rule of law based upon settled principles, controlling in its force, and wholly independent of the usage or custom of any particular port or trade. There can be no such legal rule applicable to a part of a cargo which does not govern every part and the whole.
There are, no doubt, decisions of high authority which hold that where the contract is to carry goods upon a general ship in the ocean trade, from port to port, an actual or manual tradition of *70 the goods into the possession of the consignee, or at his warehouse, is not necessary in order to discharge the carrier from his liability. A delivery with proper care at a proper time, upon the usual wharf, with due notice to the consignee, will in ordinary cases be deemed a good delivery. This rule has grown out of the long established usages of the ocean trade, and is a modification of the general rule of the common law, which required the carrier to deliver the goods to the consignee personally, or at his residence or place of business. The parties contemplating the carriage of the goods upon a vessel which could go only to the wharf, it was reasonable that she should be unladen there. And the cargoes of such vessels, being usually carried, not in bulk, but packed in boxes, barrels, bags or otherwise, and often consisting of many parcels for numerous different consignees, a delivery, of the whole cargo at one common and accustomed wharf was-almost a necessity for the proper unlading and dispatch of the vessel, and not at all onerous or inconvenient for the merchant or consignees, especially when the regulations of the government in respect to duties upon imported goods are taken into consideration.
A custom has thus been established, which is conveniently adapted to the business wants of all parties ^engaged in that particular branch of commerce, and has prevailed so long and so extensively, and is so widely known, that it may be fairly said to have become a rule of law for that trade, and, quoad hoc, to have taken the place of the old common law rule.
But rules of this character, growing out of the usages of a particular trade, are necessarily limited in their application, and may not prescribe the duty of the carrier in other branches of the same trade to the incidents and conditions of which they are not adapted. The growth of commerce, the march of enterprise, and *71 the achievements of mechanical science (at once their outgrowth and stimulus), open new channels and develop new means and appliances for the lading, carriage and delivery of goods, and in their turn they create new usages and laws which govern these new conditions and agencies in the business of the carrier. Goods transported upon railroads are delivered at the terminus or station, upon the track, in yards, sheds, or warehouses, as the convenience of parties and the exigencies of business demand. The proper mode of delivery depends largely upon the kind and character of the goods. Grain, coal, ores and oil, carried in bulk, cattle and other live freight, must each have their different and appropriate means of delivery. No other will subserve the wants of the trade, or discharge the duty of the carrier.
In like manner the vast volume of trade borne upon the waters of our inland seas must, of necessity, and in the nature of things, dictate its own laws, and all the interests involved must be governed by them. And these laws may be, nay, must be, from time to time modified or changed by the changing condition of the trade and like controlling causes. In the early history of that trade, though so recently as to be within the experience of the merchants and vessel owners of today, cargoes of grain brought by vessels to this port in bulk were delivered by measure in the half bushel, at the store-house of the consignee, or over the vessel’s rail into a canal boat lying alongside in the harbor. Now no such delivery of such a cargo would be deemed possible. Everywhere the laws of trade are the growth of or largely influenced by its physical features and external circumstances. The commerce of the lakes has felt these influences in a very marked degree, and nowhere are they more manifest than in the trade which centers at the port of Buffalo. Annually, for several years, more than fifty millions of bushels of *72 grain, water-borne by vessels, have been delivered at this point. Added to this, vast quantities of other agricultural and farm products, and the contribution of the mines and forests of the West, swell the mighty current which flows through this port to the markets of the East. This trade is carried on by sailing and steam ships of heavy burden, many of them having a capacity equal to fifty thousand bushels of grain. To promote and accommodate it extensive and costly improvements of various kinds have been made at this port. The natural capacity and extent of the harbor has been very greatly increased by the Federal, State and municipal governments, and merchants and others engaged in the traffic of the West have expended large sums in the construction of wharves, docks, canals and slips, and in the erection of machinery and mechanical appliances for the special convenience of the different branches of this traffic. The lumber from the pineries of Michigan and other Western forests, the ores of Bake Superior, the bituminous coals of western Pennsylvania and of Ohio, as well as the grain from the prairies and fields of the West, are thus each furnished with those peculiar economical agencies most fit for their discharge, storage and reshipment at this chief port of transfer intermediate the West and the East. And it is interesting to observe that the result and the purpose of this expenditure of such vast sums, and this application of the genius and skill of mechanical science has been to furnish to the carriers engaged in this inland trade every convenience and facility for the delivery of their cargoes to their consignees at their places of business according to the old rule of the common law. No one would contend that a cargo of iron ore consigned to the Union Iron Works could properly be discharged at a wharf in this port remote from the works, no matter how convenient that wharf might be for access by vessels or for unloading such a cargo. *73 The iron works have their own wharves where their furnaces are located. Large sums have been expended to construct those wharves, to render them convenient of access by vessels, and to furnish them with suitable conveniences to dispatch the unloading of such cargoes. It would be intolerable therefore that cargoes consigned to them should be delivered at another wharf, whence the transportation to the iron works would require the .hiring of another carrier, and at an expense perhaps equal to one-third of the freight from Lake Superior to this port. The same remarks are applicable to the delivery at this port of cargoes of lumber, coal and other heavy freight carried in bulk.
To no branch of the traffic of the lakes do these considerations apply with greater force “than -to the grain trade. For its service numerous elevators, with most ingenious machinery and with every facility for the business, have been constructed at different places in the harbor, but all convenient of access and use in the discharge, weighing, storage and transfer of the cargoes of grain-laden ships. Some have special conveniences for the transfer of the grain to railroad cars ; others, for its trans-shipment into canal boats, and others for drying and cleaning it, if necessary. It is well known that the grain is shipped and is delivered at this port in bulk, and that by far the greater part of it is destined .to eastern or foreign markets. The consignee here is either a merchant who sells to an eastern buyer, or merely acts as agent for the ultimate consignee upon the seaboard or other eastern destination. In either case the grain is discharged from the vessel into the elevator, and there stored until reshipped, or is transferred from the vessel through the elevator directly into cars or canal boats to be carried east. I think no one would contend that a cargo of grain, consigned at this port to the care of the New York Central or of the Erie Railroad Company, and which was by *74 them to be carried hence to the consignee in New York, could properly be delivered at any elevator remote from the- tracks of the railroad, no matter how convenient for the vessel such elevator might be, or how suitable in every other respect for the proper discharge of the cargo. It would, be- equally subversive* of the legitimate operations and courses of the trade if a cargo of 50,000 bushels of grain, of which 26,000 bushels had been consigned to the Erie Railway Company and 24,000 bushels to the New York Central, should all be discharged into the elevator of the Erie Railway Company, because the consignees of the major part of the cargo should order that part to be there discharged.
These considerations (somewhat too diffusely set out) are, it seems to me, convincing that there is not, and in the nature of the case cannot be, any such rule of law applicable to this case as is claimed on behalf of the defendant; and that the rule of the common law that the carrier shall deliver the goods to the consignee at his place of business, prevails in respect to grain and other cargoes carried in bulk by vessels engaged in this inland trade ; and that a different rule, which had its origin in the usages of the ocean trade, and is applicable to general ships engaged in that traffic, has no force or application in respect to that class of our inland commerce to which the question in this case relates.
It seems to have been assumed by both parties, on the trial of this cause, that it is the usage for a vessel arriving at this port, laden with a cargo of grain all of which is consigned to one person, to notify the consignee and to discharge the grain into such elevator as the consignee shall direct. All the witnesses testified in effect that such is the usage of this port, in all cases where there is one consignee of the whole cargo. The defendant sought to establish a different usage in cases where the cargo is made up of two or more parcels of *75 grain having different consignees. As I have already said, I think he failed to prove such a usage as makes it the custom of the port, having the force of law, to deliver the entire cargo at the elevator selected by the consignee of the major part. But even the defendant’s witnesses were compelled to say that carriers do often, and I may say usually, deliver minor parcels of a cargo of grain at the elevator designated by the consignees of such parcels; though they insisted that this is done as a matter of accommodation, and not because the consignee has, in such cases, a right to require such a delivery. But their testimony, as well as other evidence in the case, strongly tends to prove the propriety, if not the necessity, of the rule which will, in respect to this trade, demand that the cargo, whether a whole or in parcels, shall be delivered to the consignee at his elevator or that which he makes his for the purpose of his business. While all grain-laden vessels entering this port discharge their cargoes into elevators, yet no one elevator more than another is the usual or accustomed place for the discharge of such cargoes. In this respect, all the elevators are alike and equal. And as all are convenient of access, and, so far as the vessel is concerned, have essentially the same kind of machinery and facilities for the discharge of cargoes of grain, there is, substantially, no difference in convenience to the vessel, whether on arrival here it goes to one elevator or another; whereas in many, perhaps in most instances, it is, as we have seen, of very serious importance to the consignee that the grain shall be delivered at his elevator, or that which he has chosen for the purposes of his business.
We may further observe that the argument drawn from the alleged inconvenience of moving a vessel from one elevator in this port to another, to deliver different parcels of a cargo of grain, is greatly weakened, if not wholly refuted, by the proof that it is the constant *76 custom of vessels, when taking' on their cargoes of grain at Chicago and other western ports, to receive different parcels from different elevators, and to move in those ports from one elevator to another for that purpose. In this way the consignment of the same cargo, in parcels, to different consignees at this port, often originates, and it is difficult to perceive any good reason why the vessel should not, in this respect, deliver her cargo at the port of destination in the same manner in which she receives it, under like conditions, at the port where she is laden.
I am fully satisfied that the conclusions of the judge before whom this cause was tried were, both as to the law and the facts, just and right, and the judgment should therefore be affirmed with costs.
Judgment affirmed with costs.

 Present-Sheldon, Ch. J., and Smith and Beckwith, JJ.